**STATE of Tennessee**

**v.**

**Sabrina Renee LEWIS.**

Supreme Court of Tennessee, at Nashville.

April 27, 2007 Session Heard at Clarksville.[1]

Aug. 17, 2007.

Jay Norman, Nashville, Tennessee, for the appellant, Sabrina Renee Lewis.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Pamela Anderson and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, CORNELIA A. CLARK, JJ., and FRANK F. DROWOTA, III, Sp.J., joined.

The Defendant, Sabrina Renee Lewis, was convicted of criminally negligent homicide and facilitation of especially aggravated robbery. The trial court imposed a twenty-one-year effective sentence. The Court of Criminal Appeals affirmed. We granted permission to appeal in order to consider three evidentiary questions, the last two of which require interpretations of the federal and state constitutional provisions relating to the right of confrontation: (1) whether a videotaped statement by the Defendant was admissible as "against interests"; (2) whether a statement by the victim was admissible as a dying declaration; and (3) whether expert testimony regarding DNA test results was admissible. Because the videotaped statement by the Defendant was properly allowed as an admission by a party opponent, because a testimonial dying declaration does not violate the right of confrontation under the federal or state constitution, and because confrontation rights do not prohibit an expert evaluation of DNA data, the judgment of the Court of Criminal Appeals is affirmed.

On July 13, 2001, Gary Dean Finchum ("the victim") was shot during a robbery of his antiques store. He later died from his injuries. For her role in the crimes, Sabrina Renee Lewis ("the Defendant"), who was originally charged with felony murder and especially aggravated robbery, was convicted by a jury of criminally negligent homicide and facilitation of attempted especially aggravated robbery.

### Factual and Procedural Background

The victim and his wife, Linda Finchum ("Finchum"), owned and operated Always Antiques in Madison. Some three weeks before the shooting, the Defendant stopped at the store seeking an estimate of value for two vases that she wanted to sell. Because the victim, who had left for the day, was responsible for the appraisals, Finchum asked the Defendant to come back later. The Defendant returned in two weeks, purportedly looking for a gift for her mother who lived in New York. The Finchums offered to travel to the Defendant's residence to examine the vases but she declined, explaining that she would return with the vases later in the day. Finchum did not see the Defendant again that day, but at approximately 10:00 a.m. on the day of the shooting, the victim telephoned her and before ending the conversation remarked, "I believe the woman with the vases is coming in."

One hour later, at approximately 11:00 a.m., Brenda Farmer and Judy Summers, who worked at Pugh's Pharmacy, heard several loud crashes coming from the direction of the antiques store located next door. Summers saw someone enter the front passenger's side of an older, gray, "long" vehicle which was parked outside the back door with the motor running. After a few minutes, the two women walked to the antiques store to investigate the noises. As they entered, the victim called out for help and asked them to "call 911," explaining that he had been "shot in the heart." Farmer ran back to the pharmacy, informed the other employees of the situation, and directed them to call 911. When she returned, the victim informed Farmer that "they" tried to rob him and that "a black man in blue jeans" had shot him. Summers, who also noticed a bullet wound in the victim's arm, observed the victim's shallow breathing and believed that he would likely die before the ambulance arrived.

Detective Mike Chastain of the Metro Police Department Armed Robbery unit arrived at the scene prior to the paramedics and observed the victim lying on the floor at the rear of the store. The victim, who was in "obvious pain" and

"blood[-]soaked," identified himself to the detective and when asked if he had been robbed, responded, "[H]e tried to." He described his assailant as a "young male black" and showed the detective a blue, "floppy" hat that he had left behind. When the paramedics arrived and initiated treatment, the victim pointed with both of his hands and said, "[O]fficer, officer, the lady's information is on the desk." When asked about what "lady" to whom he was referring, the victim responded, "[T]he lady with the vases." On further questioning about whether the "lady" was connected to the robbery and shooting, the victim stated, "I know she is." Another detective found a piece of paper on the counter bearing the name "Sabrina Lewis," what appeared to be a driver's license number, and the words "two vases."

Detective Norris Tarkington discovered an address for "Sabrina Lewis," drove to her residence, and knocked on the door. Several minutes later, the Defendant answered the door and agreed to travel to the police station to provide a statement. The police also determined that the Defendant had a gray, late 1980s model vehicle registered in her name.

In a videotaped statement, the Defendant admitted to the police that she was in the antiques store on the date of the shooting, explaining that she had spoken with the victim, had negotiated a $125 price for the vases, and had given the victim her contact information. She claimed that she left the antiques store in a car that she had borrowed from her ex-boyfriend, dropped it off at Vanderbilt University Medical Center, and then visited at her mother's house for a few hours before returning to her own residence. The Defendant told the police that she gave $100 of the sale proceeds to her son and kept the remainder.

During the investigation, the police learned that at the time of the shooting,

Mary Fisher was driving her vehicle when she saw a black man run out of Always Antiques with a black object in his hand. She described him as dressed in a red shirt, blue jeans, and tennis shoes. Fisher also noticed a car driven by an unidentified woman at the corner of a side street flanking the antiques store. According to Fisher, the woman made a left turn through a red light, nearly hitting her vehicle.

Six months after the shooting, a detective interviewed Fisher, who at that time was incarcerated for driving under the influence. When shown photographs of a number of women, she mentioned that a photograph of the Defendant looked familiar. Within a day or so thereafter, she identified the Defendant as the woman driving the getaway car. At trial, Fisher again identified the Defendant as the driver.

Terry Battle, a prison inmate, testified at the trial as a witness for the State. He recalled that when the Defendant visited him in prison only weeks after the shooting, she informed him that she was under investigation for the shooting death of a man in Madison. According to Battle, the Defendant explained that she sold some vases to a man at an antiques store, drove to her mother's home, and told a cousin nicknamed "Black" that the man had a large sum of money. The Defendant told Battle that she drove her mother and "Black" to the antiques store, that "Black" went inside while she and her mother waited in the vehicle, and that she heard a shot after which "Black" ran out of the store and jumped into the vehicle. According to Battle, the Defendant informed him that she then transported "Black" to a nearby housing project.

Dr. Terry Melton, a forensic scientist specializing in mitochondrial DNA analysis, testified that her laboratory performed an analysis on hairs taken from the floppy

hat found at the scene. After comparing the DNA profile of the hair with the DNA of the Defendant's sons, Eton and Todd Bryant, she determined that neither individual could be excluded as the contributor of the hair. She explained that individuals with the same mother share an identical mitochondrial DNA profile, not only with each other but also with their maternal relatives. Dr. Melton, who testified that the mitochondrial DNA profile excluded 99.94% of the North American population, confirmed that the hair sample was completely consumed during testing and pointed out that the same mitochondrial DNA profile would also be found in the Defendant, her sisters and brothers, her sister's children, and her mother, that is, all of the maternal relatives of Eton and Todd Bryant. During cross-examination, Dr. Melton acknowledged that a co-worker, Dr. Kimberly Nelson, actually performed the mitochondrial DNA testing. She asserted, however, that she did "analyze all of the data on that sample and on every sample."

At the conclusion of the trial, the State conceded that the evidence was insufficient to support especially aggravated robbery. In consequence, the trial court instructed the jury only on the offenses of felony murder, attempted especially aggravated robbery, and their lesser-included offenses. The jury returned guilty verdicts on the lesser-included offenses of facilitation of attempted especially aggravated robbery and criminally negligent homicide. After a sentencing hearing, the trial court sentenced the Defendant to six years as a Range III, persistent offender for the criminally negligent homicide and fifteen years as a Range III, persistent offender for the facilitation of attempted especially aggravated robbery. Because the sentences were ordered to be served consecutively, the effective sentence is twenty-one years.

## Standard of Review

Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court and this Court will not interfere with the exercise of this discretion in the absence of a clear showing of abuse appearing on the face of the record. *See State v. DuBose,* 953 S.W.2d 649, 652 (Tenn.1997); *State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris,* 839 S.W.2d 54, 73 (Tenn.1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz,* 204 S.W.3d 772, 778 (Tenn.2006) (citing *Howell v. State,* 185 S.W.3d 319, 337 (Tenn.2006)); *see also State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999) (considering abuse of discretion standard as applied to trial court's decision to sever offenses). "[D]iscretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles." Martha S. Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking,* 2 J.App. Prac. & Process 47, 58 (2000) (citations and internal quotation marks omitted). "Abuse is found when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination." *Id.* at 59.

"[W]hether the admission of hearsay statements violated a defendant's rights under the Confrontation Clause," however, "is purely a question of law." *State v. Maclin,* 183 S.W.3d 335, 342 (Tenn.2006) (citing *Lilly v. Virginia,* 527 U.S. 116, 125, 119 S.Ct. 1887, 144 L.Ed.2d

117 (1999)). "The application of the law to the facts found by the trial court is a question of law" that is subject to de novo review. *Id.* at 343 (citing *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997); *Beare Co. v. Tenn. Dep't of Revenue,* 858 S.W.2d 906, 907 (Tenn.1993)).

### *The Confrontation Clause*

█ Initially, the resolution of two of the issues in this case depends in great measure upon recent decisions by the United States Supreme Court interpreting the Confrontation Clause found in the Sixth Amendment of the United States Constitution. The clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Traditionally, this Court has interpreted the provision as affording "two types of protection for criminal defendants: the right to physically face the witnesses who testify against the defendant, and the right to cross-examine witnesses." *State v. Williams,* 913 S.W.2d 462, 465 (Tenn.1996) (citing *State v. Middlebrooks,* 840 S.W.2d 317, 332 (Tenn. 1992); *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). The Confrontation Clause is designed "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). For years, Sixth Amendment challenges to out of court statements have been considered under the guidelines established by the United States Supreme Court in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In

*Roberts,* the Court held that "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable," *id.* at 66, and even when there is a showing of unavailability, the hearsay statement "is admissible only if it bears adequate 'indicia of reliability,'" *id.* "[U]nder *Roberts,* an out-of-court statement by an unavailable witness is admissible if it (1) falls within a firmly rooted exception to the hearsay rule or (2) contains such particularized guarantees of trustworthiness that adversarial testing of the statement through cross-examination would add little to the assessment of whether the evidence is reliable." *Maclin,* 183 S.W.3d at 344.

In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), however, the Supreme Court departed from its ruling in *Roberts* and established a new standard for the admissibility of hearsay statements under the Confrontation Clause.[2] *Id.* at 61. The Court concluded that "testimonial" hearsay is admissible only where the declarant is unavailable and there was "a prior opportunity for cross-examination." *Id.* at 68, 100 S.Ct. 2531. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Id.* The Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.*

We first considered the application of the *Crawford* ruling in *Maclin,* holding that "[a]fter *Crawford,* the threshold ques-

---

**2.** Described as a rule of criminal procedure rather than one of evidence, "the principal evil at which the Confrontation Clause was

directed was the . . . use of *ex parte* examinations as evidence against the accused." *Crawford,* 541 U.S. at 50, 124 S.Ct. 1354.

tion in any Confrontation Clause case is whether a challenged statement is testimonial or nontestimonial." *Maclin,* 183 S.W.3d at 345. "If it is testimonial, the statement is inadmissible unless (1) the declarant is unavailable and (2) the accused had a prior opportunity to cross-examine the declarant. If it is not testimonial, then the states are free to apply their own hearsay law to determine the statement's admissibility." *Id.* (citation and footnote omitted). Our conclusion as to nontestimonial hearsay was that the ruling in *Roberts* governed. *Id.* at 351. In addition, we adopted a non-exhaustive list of factors to aid in the determination of whether a particular statement is testimonial:

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

*Id.* at 349. We described this standard as objective in nature. *Id.* In essence, the factors were designed to determine

"whether the statement was made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id.* at 354 (quoting *Crawford,* 541 U.S. at 52, 124 S.Ct. 1354).

Since our decision in *Maclin,* the United States Supreme Court has issued two opinions interpreting *Crawford.* In the first of those cases, *Davis v. Washington,* — U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and its companion case, *Hammon v. Indiana,* — U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006),[3] the Court departed further from *Roberts,* concluding that only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause" and determining that "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."[4] *Davis,* 126 S.Ct. at 2273, 126 S.Ct. 2266. Thus, the ruling in *Davis* that the Confrontation Clause is inapplicable to nontestimonial hearsay conflicts with our interpretation in *Maclin* that the *Roberts* test should be used to determine the admissibility of nontestimonial hearsay. The Supreme Court distinguished testimonial and nontestimonial hearsay as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.

---

**3.** In *Maclin,* we observed that "[c]ourts across the country are grappling with the distinction between 'testimonial' and 'nontestimonial' hearsay and coming to different, often conflicting, results." 183 S.W.3d at 345. We also noted that the United States Supreme Court had granted certiorari in both *Davis* and *Hammon* "presumably to clarify

what was meant by the term 'testimonial.'" *Id.* at 345 n. 9.

**4.** Typically, the term "testimony" means "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Davis,* 126 S.Ct. at 2274 (quoting *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354).

They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2273–74. With this guidance, the Court established precedents for the treatment of 911 calls and statements made to officers at a crime scene. In *Davis,* the Court determined that the content of a call describing an ongoing physical attack was nontestimonial, *id.* at 2276–77, while, in *Hammon,* the statements made by the victim in response to police questions shortly after she was attacked by her husband were deemed testimonial, *id.* at 2278–79.

In the second case, *Whorton v. Bockting,* —— U.S. ——, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), the Court declined to apply *Crawford* retroactively[5] and reiterated its holding that nontestimonial hearsay is not subject to challenge under the Confrontation Clause:

> Under *Roberts,* an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford,* on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability.

*Id.* at 1183. The Court observed that "*Roberts* potentially excluded too much testimony because it imposed Confrontation Clause restrictions on nontestimonial hearsay." *Id.* at 1179. While these cases from the United States Supreme Court establish that an analysis of nontestimonial hearsay under *Roberts* is not necessary under the federal Confrontation Clause, they do not necessarily answer the question of whether the analysis is necessary under our state constitution.

The Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right ... to meet the witnesses face to face." Tenn. Const. art. I, § 9. While the provision differs from the Confrontation Clause, "this Court has largely adopted the standards used by the United States Supreme Court ... in determining whether the Tennessee constitutional right has been violated." *Maclin,* 183 S.W.3d at 343 (citing *State v. Bush,* 942 S.W.2d 489, 511 n. 2 (Tenn.1997); *State v. Middlebrooks,* 840 S.W.2d at 332; *State v. Causby,* 706 S.W.2d 628, 631 (Tenn.1986); *State v. Armes,* 607 S.W.2d 234, 236–37 (Tenn.1980)). The ruling in *Armes* supports that conclusion. In that case, this Court held that the same "standards and criteria" apply when determining whether the evidence satisfies both the state and federal constitutions. *Armes,* 607 S.W.2d at 236 (citing and discussing the ruling in *State v. Henderson,* 554 S.W.2d 117 (Tenn.1977)). While this Court has since observed "that '[t]he "face to face" language found in the Tennessee Constitution has been held to impose a higher right than that found in the federal constitution,' " *Maclin,* 183 S.W.3d at 343 (quoting *State v. Deuter,* 839 S.W.2d 391, 395 (Tenn.1992)), we have found no evidence to have been excluded under our state constitution's confrontation clause that was not also excluded under the federal constitution's counterpart.

■ We observed in a footnote in *Maclin* that a commentator had suggested

5. The Court refused to declare *Crawford* a "watershed rule," concluding that it did not remedy "an 'impermissibly large risk' of an inaccurate conviction." *Bockting,* 127 S.Ct. at 1182 (quoting *Schriro v. Summerlin,* 542 U.S. 348, 356, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (internal quotation marks omitted)).

that it might be "prudent" to apply the *Roberts* analysis to nontestimonial hearsay and proceeded to do so without discussion. *Maclin,* 183 S.W.3d at 345 n. 8, 351. However, as indicated, the ruling in *Davis* does not require such an analysis under the federal constitution and we see no reason to interpret our state constitution any differently. It is our view, therefore, that a *Roberts* analysis for nontestimonial evidence is not necessary to satisfy the state constitution's "face-to-face" requirement and *Crawford* and its progeny establish appropriate guidelines. In summary, when hearsay evidence is nontestimonial and otherwise admissible under our Rules of Evidence, a separate analysis under *Roberts* is unnecessary under either the federal or state constitutions.

### Analysis

#### I. The Defendant's Videotaped Statement

■ As her first issue on appeal, the Defendant contends that the trial court erred by admitting her videotaped statement to police as an admission by a party opponent under Rule 803(1.2)(A) of the Tennessee Rules of Evidence because the statement does not qualify as "against her interests." The State submits that an admission by a party opponent need not be against the declarant's interest in order to be admissible.

■ Rule 803(1.2) provides that "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(1.2) (2006). Although the Court of Criminal Appeals classified the statement as "an admission against interest," the rule does not require that a statement be against interest as a condition for admissibility:

Contrary to some common misconceptions, it does not matter that the statement was self-serving when made but turns out to be harmful by the time of trial. Accordingly, the misleading term, "admission against interest," should be banned from . . . appellate opinions. Under Rule 803(1.2)(A), it does not matter whether the declaration was self-serving when made. . . . If the opponent wants to use it, the statement comes in as evidence.

Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.06[3][a] at 8–47 to 8–48 (5th ed.2005). "Anything the opposing party said or wrote out of court is admissible in court against that party. Whether the statement was disserving or self-serving when made is immaterial." Donald F. Paine, *Paine on Procedure: Admissions 'against interest',* 43 Tenn. B.J. 32 (April 2007). In summary, a statement need not be against interest when made by a party opponent to qualify for admission under Rule 803(1.2). The Defendant's statements, both written and oral, are admissible, subject to exclusion only by other rules of evidence. *State v. Binion,* 947 S.W.2d 867, 874 (Tenn.Crim.App.1996); Neil P. Cohen et al., *supra* § 8.06[3][a], at 8–47.

Here, the State introduced the videotaped statement of the Defendant taken on the date of the offense. When questioned by police, the Defendant acknowledged that she went to Always Antiques on the morning of the shooting and that she sold two vases to the victim for $125. She claimed, however, that she left and did not return, denying any connection to the shooting or the attempted robbery. Because the statement was made by the Defendant and was not subject to exclusion under any other rule of evidence, it was properly introduced as an admission by a party opponent. The trial court did not err by admitting the videotaped statement.

## II. The Victim's Statements

Our next consideration is whether the admission of the victim's statement to Detective Chastain that he "knew" the "lady with the vases" was involved in the offenses qualifies as a dying declaration and, if so, is admissible in the context of the right of confrontation. The Defendant argues that the statement was merely an opinion and should not have been permitted as a dying declaration. Although the Court of Criminal Appeals agreed that the victim's statement did not qualify for admission as a dying declaration because it was an expression of opinion, it ruled that the error was harmless, having no effect on the verdict. The Defendant does not challenge the admissibility of the victim's earlier statement to Brenda Farmer that "they" had tried to rob him and that "a black man in blue jeans" was the gunman.

■■■ As indicated, the general rule established in *Crawford* bars the admission of testimonial hearsay absent a showing of unavailability and a prior opportunity for cross-examination. So our first step is to determine the nature of the statement. In *Davis*, the Court held that a description of past events to the investigating law enforcement officers is testimonial. *Davis*, 126 S.Ct. at 2273. Statements are nontestimonial, however, when circumstances indicate that they are designed to "enable police assistance to meet an ongoing emergency." *Id.* In *Davis*, the evidence at issue was an audiotape of the victim's telephone call to 911. During the call, the victim stated that she was being attacked by Davis. The Court classified the statements as nontestimonial and contrasted them with the statements at issue in *Crawford*:

> [The victim in *Davis* ] was speaking about events *as they were actually happening*, rather than "describ[ing] past events." Sylvia Crawford's interroga-

tion, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that [the victim] (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, [the victim's] call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered ... again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford* ) what had happened in the past. . . . And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly ... to a series of questions, with the officer-interrogator taping and making notes of her answers. . . .

*Id.* at 2276–77 (citations omitted). While the threshold question as to the nature of the statement by the victim here is a closer call, both *Davis* and its companion case, *Hammon*, are particularly instructive. The police responding to the scene of "a 'reported domestic disturbance' at the home of Hershel and Amy Hammon" found Amy Hammon alone on the porch. After receiving her permission to enter the residence, the officers observed signs of a struggle and separately questioned her. She provided details of the attack by her husband. The Court classified her statements as testimonial:

> It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct. . . . There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything. When the officers

first arrived, Amy told them that things were fine, and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.

*Id.* at 2278 (citations omitted). The Court made the following distinction between the statements used in the prosecution of Davis and that of Hammon:

> The statements in *Davis* were taken when [the victim] was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. [The victim's] present-tense statements showed immediacy; Amy's narrative of past events was delivered at some remove in time from the danger she described.

*Id.* at 2279.

It is our view that the victim's statement to Detective Chastain, that he "knew" that "the lady with the vases" was involved in the offenses, qualifies as testimonial.[6] The assailant had left the store. The victim had talked to Summers and Farmer who were first to arrive at the scene. The 911 call had already been

made.[7] In *Davis*, the Court pointed out that "the fact that [statements were] given at an alleged crime scene and were 'initial inquiries' is immaterial." *Id.* While the victim's statements here took place at the crime scene, they were responses to inquiries by the investigating officers. Even though the victim was in a state of distress from his wounds, his comments did not describe an "ongoing emergency," as defined in *Crawford*, and were instead descriptions of recent, but past, criminal activity as in *Hammon*. Because the statements were testimonial, we must next consider whether they should have been excluded under the rule in *Crawford* which not only requires the unavailability of the declarant, which was obviously satisfied, but the opportunity for cross-examination, which was not.

As indicated, the trial court admitted the victim's statements under the dying declaration exception to the hearsay rule. In *Crawford*, the Court included a footnote, describing the dying declaration as historically unique in the prosecution of homicide and hinting at the admissibility of such statements, even if testimonial:

> The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. *Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are.* We need not decide in this case whether the Sixth Amendment in-

---

6. Although the victim made other statements to Detective Chastain, including providing a description of the shooter and identifying the hat he wore, the Defendant does not challenge the admissibility of these statements. Her challenge is, instead, confined to the victim's statement, "I know she is," given in response to Detective Chastain's question of whether "the lady with the vases" was involved in the shooting and robbery attempt.

7. The ruling in *Davis* requires trial courts to determine which portions of a call to the police are directed at addressing an exigency of the moment and which portions should instead be classified as testimonial. Courts must "redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Davis*, 126 S.Ct. at 2277.

corporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis.*

*Crawford,* 541 U.S. at 56 n. 6, 124 S.Ct. 1354 (citations omitted) (emphasis added). Since *Crawford,* we found no jurisdiction that has excluded a testimonial dying declaration. Several states have specifically allowed the declaration as an exception to the rule in *Crawford. See, e.g., Wallace v. State,* 836 N.E.2d 985, 992–96 (Ind.Ct.App. 2005); *State v. Young,* 710 N.W.2d 272, 283–84 (Minn.2006).

■ Because the admissibility of the dying declaration is also deeply entrenched in the legal history of this state, it is also our view that this single hearsay exception survives the mandate of *Crawford* regardless of its testimonial nature.[8] *See also People v. Monterroso,* 34 Cal.4th 743, 22 Cal.Rptr.3d 1, 101 P.3d 956, 971–72 (2004) (discussing the admission of a testimonial dying declaration after *Crawford* in light of that state's common law). This Court addressed a challenge to the admission of a dying declaration under the "face-to-face" provision of article 1, section 9 of our state constitution almost 170 years ago. In *Anthony v. State,* 19 Tenn. (Meigs) 265 (1838), this Court held that "we are all of opinion that the Bill of Rights [in reference to the 'face-to-face' provision] can not be construed to prevent declarations properly made in *articulo mortis,* from being given in evidence against defendants in cases of homicide." *Id.* at 277.

Rule 804(b)(2) of the Tennessee Rules of Evidence, effective January 1, 1990, is the common law embodiment of the dying declaration:

> Statement Under Belief of Impending Death.—In a prosecution for homicide, a statement made by the victim while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death.

Tenn. R. Evid. 804(b)(2) (2007). The Advisory Commission Comments to the rule confirm that "[t]he rule retains Tennessee's common law limitations. The trial must be for homicide of the declarant, and the declaration is limited to circumstances surrounding the declarant's death." *Id.,* Advisory Comm'n Cmts. "The traditional underlying theory is that a person who knows that he or she is facing imminent death will be truthful, for the eternal consequences of dying 'with a lie on one's lips' are too monumental to risk." Cohen, et al., *supra,* § 8.35[2][a] at 8–155. Indeed, the awareness of impending death has been deemed "equivalent to the sanction of an oath." *Anthony,* 19 Tenn. at 278 (citation and internal quotation marks omitted). Long ago, this Court more specifically addressed the reason behind the rule:

> [W]hen the party is at the point of death, and when every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most powerful consideration to speak the truth, a situation, so solemn and so awful, is considered by

---

8. There is a historical and literary basis for the Supreme Court's recognition of the exception. As early as the twelfth century, dying declarations merited special treatment in the courts. 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1430 n. 8 (James H. Cadbourn rev.1974). Some authorities suggest the rule is of Shakespearian origin. In "The Life and Death of King John," Shake- speare has Lord Melun utter that, with "hideous death within my view, [r]etaining but a quantity of life, [w]hich bleeds away," he had "los[t] the use of all deceit" and asked, "Why should I then be false, since it is true [t]hat I must die here and live hence by truth?" William Shakespeare, The Life and Death of King John act. 5, sc. 2, lines 26–33.

the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice. *Smith v. State,* 28 Tenn. (9 Hum.) 9, 19 (1848) (citation and internal quotation marks omitted). This time-honored dying declaration exception to the rule against hearsay has five elements:

(1) The declarant must be dead at the time of the trial;

(2) the statement is admissible only in the prosecution of a criminal homicide;

(3) the declarant must be the victim of the homicide;

(4) the statement must concern the cause or the circumstances of the death; and

(5) the declarant must have made the statement under the belief that death was imminent.[9]

Cohen et al., *supra,* § 8.35[2][b]-[f] at 8–156; *see also State v. Hampton,* 24 S.W.3d 823, 828–29 (Tenn.Crim.App.2000).

▮ The Defendant concedes that these five conditions have been satisfied but argues that the victim's statement should have been excluded because it is an opinion rather than an assertion of fact. The Court of Criminal Appeals, relying on *Baxter v. State,* 83 Tenn. 657 (1885), held that "[b]ecause opinion evidence by a lay witness is not generally admissible, the declarant's expression of an opinion ... is not generally admissible in evidence as a

dying declaration." Our opinion, however, is that "[t]he lay opinion rule should be relaxed somewhat here, as was the case under prior law." Cohen et al. *supra,* § 8.35[2][e] at 8–156 (citing *Sherman v. State,* 125 Tenn. 19, 140 S.W. 209, 215 (1911)). We believe that the common law supports that conclusion.

Cases pre-dating the adoption of our rules of evidence have been understandably inconsistent when considering the admissibility of an opinion expressed as part of a dying declaration. In *Sherman,* for example, the victim exclaimed, "He killed me without a cause." The declaration was allowed despite a claim of self-defense and the assertion that the evidence was an expression of opinion. 140 S.W. at 215. In *Baxter v. State,* however, this Court did observe (although in *dictum* ) that dying declarations "must speak, *in general,* to facts only, and not to mere matters of opinion." 83 Tenn. at 661 (emphasis added). In that case, the decedent's statement "[The defendant] knew he did it. He looked like it" was deemed, under the circumstances, too speculative and would have been excluded had an objection been lodged. *Id.* at 664. In *Still v. State,* 125 Tenn. 80, 140 S.W. 298 (Tenn.1911), this Court, characterizing the dying declaration as a rule of necessity, held that a statement of opinion should be excluded when "aided by conjecture or supposition." *Id.* at 300 (citations and internal quotation marks

---

9. In *Dickason v. State,* 139 Tenn. 601, 202 S.W. 922, 923 (1918), a gunshot wound to the abdomen resulting in little chance of survival was deemed a sufficient basis for the victim to believe death was imminent. *See also State v. Keels,* 753 S.W.2d 140, 144 (Tenn.Crim.App. 1988). Conversations between the declarant and a physician or a family member about physical condition may be important indicators. *See, e.g., Crittendon v. State,* 157 Tenn. 403, 8 S.W.2d 371 (1928). The "primary requirement of such proof is that the victim

had a certain belief that rapid death was inevitable." David Lewis Raybin, *Tennessee Criminal Practice and Procedure* § 27.305 (1985). The declarant must have a "fixed and solemn belief that death is inevitable and near at hand." 41 C.J.S. *Homicide* § 274 (1991). In an 1878 case, however, this Court expressed some concern about the expansion of the dying declaration exception to the rule against hearsay because such testimony is subject to many objections and inherent infirmities. *Poteete v. State,* 68 Tenn. 261, 271 (1878).

omitted). In an effort to clarify the rule, the Court limited the admissibility "to identify the prisoner ..., the circumstances of the [killing], and ... the transaction from which the death results." *Id.* (citations and internal quotation marks omitted).

The traditional authorities have recognized that the general rule, which allows a statement of fact but precludes a mere opinion, often created confusion in the effort to separate one from the other. D.E. Evins, Annotation, *Admissibility in criminal trial of dying declarations involving an asserted opinion or conclusion,* 86 A.L.R.2d 905 (1962). Nevertheless, the prevailing standard at common law permitted an opinion or conclusion "as to the identity of the assailant ... where it was determined that such a statement was reasonable in view of the surrounding circumstances." 86 A.L.R.2d 905 at § 2. In contrast, an expression of opinion as to identity has been excluded when the circumstances established that the victim "could not have known whether [the defendant] fired the fatal shots." *Stevens v. Commonwealth,* 221 Ky. 222, 298 S.W. 678, 679 (1927).

■ Because a dying declaration is essentially a substitute for the testimony of the victim, the admissible evidence is limited to that to which the victim could have testified if present. Applying this reasoning, lay opinion should not be allowed simply because it is in the form of a dying declaration but it must not be unduly restricted when reasonably based. This historical perspective comports with Rule 701 of the Tennessee Rules of Evidence, which specifically governs the admission of opinion evidence by a lay witness:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

> (1) rationally based on the perception of the witness and

> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). Here, the record suggests that the victim's identification of the Defendant is "rationally based upon the perception" of the victim. That is in compliance with the evidentiary rule. If the victim had lived, he would have been permitted to offer this testimony at trial. Under these circumstances, it is our view that the statement, while an expression of opinion and testimonial in nature, was admissible as a dying declaration, an evidentiary rule which has thus far survived *Crawford* and its progeny.

### III. Testimony of Dr. Melton

Because Dr. Melton did not actually perform the DNA analysis on the hat found at the scene, the Defendant challenges the admissibility of her testimony. The Defendant complains that she was denied the opportunity to confront the person who "actually manipulated the sample." The Court of Criminal Appeals ruled "that Dr. Melton's testimony was properly admitted under Tennessee Rule of Evidence 703, which allows an expert to utilize inadmissible but reliable hearsay as a basis for [her] opinion, and the admission of her testimony did not violate the ... confrontation rights."

■ Dr. Melton testified that she analyzed the laboratory work that was performed by her colleague, Dr. Kimberly Nelson. She explained:

> [I]n our laboratory, we use the model of the FBI, which is that we have technicians who do the bench work and those technicians are not testifying personnel. They do the laboratory work.

Dr. Nelson and I do all the data analysis and supervise the work of the technicians, so that is our standard procedure.

. . . .

She [Dr. Nelson] performed exactly as a technician would in this case. Sometimes when we get very busy, she will do some laboratory work and she's qualified to do that, but typically, she does not do laboratory work. She and I analyze the data, write the reports, and testify.

In our view, Dr. Melton's testimony concerning the DNA test did not violate the Defendant's right to confrontation. Dr. Melton, who evaluated the data gathered by Dr. Nelson, admittedly based her testimony upon the hearsay contained within that data. Rule 703 of the Tennessee Rules of Evidence provides, however, that

[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703 (2007). Because the Defendant does not contend that the data was untrustworthy or otherwise not of a type generally relied on in the field of mitochondrial DNA analysis, it is our view that Dr. Melton's testimony was admissible under Rule 703.

■■■ Of equal importance, Dr. Melton's testimony did not violate the Defendant's right of confrontation. In *United States v. Henry*, 472 F.3d 910 (D.C.Cir.2007), the United States Court of Appeals for the District of Columbia held that "*Crawford*

. . . did not involve expert witness testimony and thus did not alter an expert witness's ability to rely on (without repeating to the jury) otherwise inadmissible evidence in formulating his opinion under Federal Rule of Evidence 703." *Id.* at 914 (footnote omitted). Other jurisdictions have reached similar conclusions. *See, e.g., United States v. Lombardozzi,* 491 F.3d 61 (2d Cir., 2007); *United States v. Adams,* 189 Fed.Appx. 120, 124 (3d Cir. 2006); *United States v. Stone,* 222 F.R.D. 334, 339 (E.D.Tenn.2004). Indeed, one author has observed that "[m]ost courts have concluded that the Confrontation Clause is satisfied if the defendant has an opportunity to cross-examine the expert because his opinion is in evidence—not the underlying facts." Ross Andrew Oliver, Note, *Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence 703 after Crawford v. Washington,* 55 Hastings L.J. 1539, 1540 (2004). This is true "even if the expert relied on hearsay to form the basis of his opinion." *Id.* at 1555.

Here, the data gathered by Dr. Nelson was not admitted into evidence. The jury did not hear her "testimony." Dr. Melton's expert opinion was an evaluation of the data. She did not communicate any out-of-court statement made by Dr. Nelson. In consequence, it is our view that the trial court did not err by admitting the testimony.

### Conclusion

The statement of a party need not be against that party's interest in order to be admissible as an admission by a party opponent. In consequence, the trial court did not err by admitting the Defendant's videotaped statement. Because the dying declaration exception to the hearsay rule survives *Crawford's* ban on testimonial

hearsay and because the victim's statement qualifies as a dying declaration under the rule, the trial court did not err by admitting it. Finally, the trial court did not err by admitting the testimony of Dr. Melton under Rule 703 of the Tennessee Rules of Evidence. Accordingly, the judgments of the trial court and the Court of Criminal Appeals are affirmed.