IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2022

## STATE OF TENNESSEE v. KENNDRICK LEDBETTER

**Appeal from the Criminal Court for Shelby County**
No. 15-01853        Lee V. Coffee, Judge

_____

### No. W2021-00140-CCA-R3-CD

_____

The Defendant, Kenndrick Ledbetter, was convicted by a Shelby County Criminal Court jury of attempted voluntary manslaughter, attempted especially aggravated robbery, employing a firearm during the attempt to commit a dangerous felony, and convicted felon in possession of a firearm. On appeal, the Defendant challenges the sufficiency of the evidence in support of his attempted voluntary manslaughter conviction and argues that the trial court erroneously admitted prejudicial victim impact testimony and abused its discretion in not ordering that the Defendant's sentence for employing a firearm during the attempt to commit a dangerous felony be served first so that the Defendant's pretrial jail credits could be applied toward that sentence. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and J. ROSS DYER, JJ., joined.

Shae Atkinson (on appeal) and Lorna McClusky (at trial), Memphis, Tennessee, for the appellant, Kenndrick Ledbetter.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Fouche and Jamie Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

According to the State's proof at trial, at approximately 8:00 a.m. on the morning of December 20, 2013, the Defendant approached the victim, Samuel Hoskins, who was raking leaves in the front yard of a Memphis home, placed a .22 revolver to the victim's head, and demanded money. When the victim told the Defendant that he had no money, the Defendant fired a gunshot into the ground at the victim's feet and ordered the victim to lie on the ground. Instead of complying, the victim began wrestling with the Defendant for the gun. During the struggle, the Defendant shot the victim twice in the shoulder and three times in the upper thigh, breaking the victim's hip and causing the victim to fall to the ground. Before fleeing the scene, the Defendant pistol-whipped the victim in the head and called him a "broke-ass b****." Spotted a short time later by police officers, the Defendant initially attempted to elude capture but eventually surrendered to an officer. He was subsequently charged with attempted first-degree premeditated murder, attempted especially aggravated robbery, employing a firearm during the commission of or attempt to commit a dangerous felony, and convicted felon in possession of a firearm.

The Defendant proceeded to trial before a criminal court jury in December 2019, where he entered a formal not guilty plea to the first count of attempted first degree premeditated murder and formal guilty pleas to the remaining counts of the indictment.[1] In its case-in-chief, the State presented the following evidence: the victim's testimony about the crime; the testimony of the patrol officer who responded to the shooting scene after a neighbor called for help; the testimony of the patrol officer who spotted the blood-covered Defendant running down the street while attempting to conceal the gun in his shirt; the testimony of the police officer to whom the Defendant surrendered; the testimony of the lead investigator in the case; the testimony of the crime scene officer who recovered the Defendant's revolver from the trash can in which the Defendant had discarded it during his flight; and an agreed stipulation by the parties that the Defendant had a prior felony conviction and that the blood on the Defendant's clothes was the victim's. The Defendant, testifying in his own behalf, admitted that he had attempted to rob the victim but denied that he tried to kill him and claimed that his finger was not on the trigger of the weapon when it discharged. In rebuttal, the State presented the testimony of the lead investigator in the district attorney's office that a revolver does not discharge unless the trigger is pulled.

After deliberating, the jury found the Defendant guilty of the lesser-included offense of attempted voluntary manslaughter in count one and guilty of the other three counts as charged in the indictment. Because the Defendant does not challenge the sufficiency of

---

[1] Immediately after defense counsel entered the pleas on behalf of the Defendant, the trial court instructed the jury that even though the Defendant had entered formal guilty pleas to counts two, three, and four of the indictment, the State still had the burden of proof to show that the Defendant was guilty of those counts.

the evidence with respect to the counts for which he entered guilty pleas, we will summarize in detail only those portions of the trial that are relevant to the issues on appeal.

The sixty-two-year-old victim testified that on the morning of December 20, 2013, he was raking leaves in the front yard of a neighbor's residence at the request of the pastor of the local church, who provided such assistance for the church's elderly parishioners. He said he was bagging leaves at approximately 8:00 a.m. when he turned around to find the Defendant holding a gun to his head. The Defendant, whom he had never seen before, said, "Give me my [sic] money. I'm going to blow your brains out." The victim testified that he told the Defendant that he did not have any money, and the Defendant replied "You think I'm playing? I'm going to kill you." The Defendant then fired a shot into the ground at the victim's feet before once again putting the gun against the victim's head. The victim stated that the gun was a revolver with a long barrel, which he estimated as six to eight inches in length.

The victim testified that he grabbed the barrel of the gun with one hand and the victim's body with his other hand as he attempted to point the barrel of the gun away from his head. The victim explained that he believed the Defendant intended to kill him and that he "wasn't going to let [the Defendant] shoot [him] in [his] head." He said he and the Defendant wrestled for control of the gun for approximately three or four minutes. The Defendant shot the victim twice in the shoulder, but he continued to fight with the Defendant because he "kn[e]w [the Defendant] meant to kill [him]."

The victim testified that the Defendant "got mad after that" because the victim was still fighting him for control of the gun despite having been shot twice in the shoulder. The victim said the Defendant then shot him three times in the upper right leg, which broke his hip bone and caused him to fall to the ground. He said he assumed that the Defendant ran out of ammunition, because the angry Defendant then "pistol-whipped" him in the head before calling him "a sorry, broke-ass B" and running off covered in his blood. The victim stated that he was going in and out of consciousness during the beating and, therefore, could not say how many times the Defendant struck him in the head with the gun. He knew, however, that he received between thirty-three to thirty-five head sutures when he arrived at the hospital.

The victim testified that, as a result of his injuries, he spent three days in the hospital, had to use a wheelchair, a walker, and a cane for the next three years, had headaches, and went blind in one eye. He said he was unable to work and had to rely on others to pay his bills. To the current day, he was still blind in that eye, experienced regular, recurring headaches, and had persistent problems with his arms and legs, which no longer "work[ed] right."

- 3 -

On cross-examination, the victim agreed that the Defendant shot him as he was struggling with the Defendant over the gun, pistol-whipped him in the head after he had fallen to the ground, and then fled. The victim further agreed that the three shots in his leg went from his hip to above his knee and said that he now has a permanent rod in his leg.

Memphis Police Officer Eric Carlisle of the Crime Scene Investigation Unit identified the .22 caliber revolver, along with its four live rounds and four spent rounds, which he recovered from a garbage cart located along the Defendant's flight path.

The twenty-six-year-old Defendant testified that he was walking that morning, saw the victim, "held [him] at gunpoint," and asked the victim to give him his money. He said the victim replied "No." The Defendant said he stared at the victim for about five seconds before he ordered him to lie on the ground. The victim refused, and the Defendant stared at the victim for approximately four more seconds. The Defendant speculated that the victim must have realized that he was not going to shoot him, because the victim then "initiated the fight and a tussle over the gun." The Defendant testified that the victim grabbed the gun with one hand and the Defendant with the other hand as the victim attempted to take the gun away from him. During their tussle over the weapon, "the gun discharged several times, and [the victim] was shot."

The Defendant testified that his finger was not on the trigger and that he did not know what caused the gun to discharge. After the victim fell, the victim was still holding onto him and preventing him from fleeing. He, therefore, hit the victim in the head a few times with the gun until the victim let him go. The Defendant testified that his intention was only to brandish his gun and frighten the victim into giving him his money. He denied that he fired a warning shot into the ground and said that it was not his intention for the victim to be shot.

On cross-examination, the Defendant denied that he ever placed his gun at the victim's head, testifying that he pointed the gun at the victim's head from a distance of approximately four to six feet. He also denied that the victim told him that he did not have any money. He acknowledged that his finger was on the trigger of the gun when he pointed it at the victim's head but insisted that it was no longer on the trigger when he and the victim were struggling over the gun and the victim was shot. He said that both of the victim's hands were on the weapon when the weapon discharged. When asked why he did not just let go of the gun and flee, the Defendant expressed his belief that the victim would have shot him:

> A. I couldn't leave we start - - well, he initiated a fight, and we was
> fighting. So, now I'm entrapped in this situation to which, him having his

- 4 -

hands on the gun, wrestling over the gun, and I'm holding the gun, wrestling over the gun, so I can't leave.

Q. You couldn't let go of the gun?

A. Let go of the gun and probably be shot myself.

The Defendant also reiterated his direct examination testimony that he was unable to flee after the victim fell because the victim was holding him. The Defendant testified that, had he intended to kill the victim, he would have shot him instead of just hitting him in the head with the gun.

Investigator Tim Helldorfer of the Shelby County District Attorney's Office testified in rebuttal that "[r]evolvers don't just go off."

Following deliberations, the jury convicted the Defendant of the lesser-included offense of attempted voluntary manslaughter in count one and the indicted offenses in the remaining counts. At the conclusion of the sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender to four years in count one for the attempted voluntary manslaughter conviction, eleven years in count two for the attempted especially aggravated robbery conviction, six years at one hundred percent release eligibility in count three for the employing a firearm during the attempt to commit a dangerous felony conviction, and four years in count four for the convicted felon in possession of a firearm conviction. Finding that the Defendant was a dangerous offender, the trial court ordered that the four-year sentence for attempted voluntary manslaughter be served consecutively to the eleven-year sentence for attempted especially aggravated robbery. The trial court also ordered the six-year-sentence for employing a firearm during the attempt to commit a dangerous felony be served consecutively to the four-year sentence for the underlying dangerous felony of attempted voluntary manslaughter and to the eleven-year sentence for attempted especially aggravated robbery. Finally, the court ordered that the four-year sentence for convicted felon in possession of a firearm be served concurrently to the other sentences, for a total effective sentence of twenty-one years in the Department of Correction, with the first fifteen years at thirty percent release eligibility and the last six years at one hundred percent release eligibility.

Following the denial of his motion for new trial, the Defendant filed a timely notice of appeal to this court.

## ANALYSIS

### I. Victim's Testimony about his Injuries

As his first issue, the Defendant contends that the trial court erred in overruling his objection to the victim's testimony about his injuries, which the Defendant characterizes as improper victim impact testimony. The State argues, among other things, that the trial court properly found that the testimony was relevant and admissible to show that the victim sustained serious bodily injury. We agree with the State.

The admissibility of evidence generally lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is illogical or unreasonable and causes an injustice to the party complaining." *Lewis*, 235 S.W. 3d at 141 (internal quotation and citation omitted).

In overruling the Defendant's objection to the evidence, the trial court noted that, although the Defendant entered guilty pleas before the jury to counts two through four, the State still had the burden of establishing a factual basis for the pleas to support the jury's guilty verdicts for those counts. The court, therefore, ruled that the State could elicit testimony from the victim about the extent of his injuries.

We find no abuse of discretion by the trial court in admitting this evidence. To meet its burden of proving that the Defendant was guilty of attempted especially aggravated robbery, the State had to show beyond a reasonable doubt that the Defendant attempted to commit an especially aggravated robbery, which is a robbery that is accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2010 & 2018). "Serious bodily injury" includes a bodily injury that involves "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106 (34)(E) (Supp. 2011 & 2018). The victim's testimony that he had to use a wheelchair, walker, and cane for three years following the initial injuries, was unable to work, lost sight in one eye, experiences recurring headaches, and still lacks normal function of his arm and leg, was all relevant to prove that he suffered a serious bodily injury as defined by statute. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## II. Sufficiency of the Evidence

The Defendant next contends that the evidence is insufficient to sustain his conviction for attempted voluntary manslaughter because there was insufficient proof of his intent to kill the victim. In support, he cites, among other things, his having entered guilty pleas to counts two through four of the indictment, his testimony that he intended by

brandishing his gun only to frighten the victim into giving him his money, and the evidence that the victim was shot during the struggle over control of the gun. The State argues that there was ample evidence in support of the Defendant's conviction for attempted voluntary manslaughter. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2010 & 2018). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Tenn. Code Ann. § 39-11-106 (18) (Supp. 2011 & 2018). "'Knowing' means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to

cause the result[.]" *Id.* at § 39-11-106 (20). It is within the province of the jury to determine whether a person has acted after adequate provocation. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

As charged in this case, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2011 & 2018).

When viewed in the light most favorable to the State, the evidence established that the Defendant, furious at the victim's lack of money, failure to comply with the Defendant's instructions, and gall in "initiating" a fight with the Defendant over the weapon, had the intention to kill the victim when he first shot him repeatedly and then struck him multiple times in the head with the gun after the victim had fallen to the ground and was no longer fighting. From this evidence, a rational jury could have found beyond a reasonable doubt that the Defendant was guilty of the attempted voluntary manslaughter of the victim. We, therefore, affirm the Defendant's conviction for attempted voluntary manslaughter.

### III. Pretrial Jail Credits and Order of Sentences

As his final issue, the Defendant contends that the trial court "erred by not first applying Defendant's pretrial jail credit to count 3 when the trial court has the authority to do so." The record reflects that defense counsel requested that the trial court order his sentence for employing a firearm during the attempt to commit a dangerous felony be served first so that the Defendant could have his substantial pretrial jail credits applied to that sentence. The trial court denied the request, noting that, pursuant to statute, the Defendant was required to serve his sentence for employing a firearm during the attempt to commit a dangerous felony consecutively to the sentence for the underlying felony, which in this case was the attempted voluntary manslaughter sentence.

We review the trial court's consecutive sentencing determinations for an abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *State v. Bise*, 380 S.W.3d 682, 707-08 (Tenn. 2012).

We agree with the State that the trial court did not abuse its discretion in declining the Defendant's request. As the trial court observed, a trial court has no discretion to alter the order in which the mandatory consecutive sentences are to be served when a defendant

is sentenced for employing a firearm during the commission of or attempt to commit a dangerous felony. The statute specifically provides that a sentence for such an offense "shall be served consecutive to any other sentence the person . . . is sentenced to serve for conviction of the underlying dangerous felony." Tenn. Code Ann. § 39-17-1324 (e)(1) (2010 & 2018). We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing review of the record and analysis of the issues, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE