IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 27, 2008

## STATE OF TENNESSEE v. OSCAR TORRES, JR.

**Direct Appeal from the Circuit Court for Blount County**
**No. C-15563     D. Kelly Thomas, Jr., Judge**

_____

**No. E2007-00867-CCA-MR3-CD - Filed April 14, 2008**

_____

The defendant, Oscar Torres, Jr., was convicted by a Blount County jury of two counts of rape of a child, a Class A felony, for which he received an effective sentence of twenty years at 100% in the Department of Correction. On appeal, he argues that the evidence was insufficient to sustain his convictions and that the trial court committed reversible error by admitting improper rebuttal testimony from the victim. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); and Raymond Mack Garner, District Public Defender (at trial), for the appellant, Oscar Torres, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Robert L. Headrick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant's wife provided babysitting services in her home for the three-year-old victim, C.B.[1], from October 2003 until September 2004, when the victim disclosed to her parents that the defendant had sexually abused her. Following an investigation, the defendant was indicted for two counts of rape of a child, a Class A felony, and one count of aggravated sexual battery, a Class B felony.

_____

[1] It is the policy of this court to refer to minor victims of sexual abuse by their initials.

The victim testified at the August 22-24, 2006, trial that she was five years old and had just started kindergarten. Referring to her vagina and the defendant's penis as their "pee-pees," she testified that while she was alone with the defendant in his bedroom, the defendant gave her a "bad touch" on her vagina with his finger, which hurt her. She said that she and the defendant had their clothes off and were together on his bed, with the defendant sitting and her standing. The defendant's penis was "hard" and "pee" came out of it and went into the sink and on her hair, where it felt "[s]ticky." The victim testified that the defendant's "pee" also went into her mouth. She stated that when he placed his penis in her mouth, the defendant told her to "suck it like a baby bottle." The defendant told her not to tell anyone, but she later told her parents. The victim was unable to identify the defendant, even after being asked to stand in the witness box, testifying that she did not see him in the courtroom. She further testified, however, that he was married to her babysitter, Kim, and that he was bald. She said that the defendant often babysat her while Kim was at work and that no one other than the defendant had ever given her a "bad touch."

On cross-examination, the victim testified that she took her clothes off in the defendant's bedroom ten times, or every time that she was at the defendant's house. Each time, the defendant also took his clothes off and gave her a "bad touch" on her vagina. Her vagina did not bleed when the defendant hurt her by touching it. The defendant's "pee" was green and "a lot" of it went in her hair. Her clothes were on when the defendant put his penis in her mouth and off when the defendant touched her vagina. On redirect examination, the victim clarified that it was the inside of her vagina where the defendant touched her with his finger. She said that she pulled the defendant's "pee" out of her hair. She stated that the defendant touched her vagina several times but placed his penis in her mouth only once. When questioned by the trial court, the victim testified that the episodes where the defendant placed his penis in her mouth and touched her vagina with his finger occurred on the same day.

Steven Thomas Baker, the victim's father, testified that he had two children, a son who was three years old, and the victim, who would be six years old in October. From October 2003 until September 2004, he and his wife employed the defendant's wife, Kim Torres, who came highly recommended by his wife's coworker, as a babysitter for the victim and her younger brother. He said that they took their children to Torres' house, where she kept them with her three boys, who were approximately six, three, and two years old. His wife usually dropped the children off between 8:00 and 8:30 a.m., and he picked them up between 3:00 and 3:30 p.m. Baker said that there were a few occasions when the defendant was home alone with the children when he arrived in the afternoon to pick them up. He stated that, toward the end of the period in which Mrs. Torres babysat the children, she informed them that the defendant had had knee surgery and would be home from work for several weeks. She additionally informed them that she had started night school and would have to leave home approximately an hour before Baker arrived to pick up the children.

Baker testified that he and his wife stopped taking the children to the Torres' home in September 2004 after the victim made a revelation about the defendant to them. Until that point, the defendant had seemed like a "nice person" to him, and he and his wife had never had any problems with either him or Mrs. Torres. He said that the victim made her disclosure at approximately 7:00

a.m. on a Saturday following a Friday afternoon when the defendant had been home alone with the children when Baker arrived to pick them up. One to two weeks prior to that time, the victim had begun waking in the middle of the night with nightmares. In addition, she had started touching her genitalia on the outside of her clothing, which she had never done before. Baker testified that the victim had never surprised him and his wife during an intimate moment and had never seen him naked.

On cross-examination, Baker acknowledged that he never noticed anything unusual about the children when he picked them up from the defendant's home. He recalled that the defendant's knee surgery was three to four weeks prior to September 17, 2004, and said that after the surgery the defendant, who was wearing a knee brace and using crutches, was home with the children when he arrived to pick them up. On redirect examination, he testified that there were also times prior to the defendant's knee surgery when he found the defendant watching the children when he arrived at the Torres' home.

Detective James Wilson of the Blount County Sheriff's Department testified that he participated in the investigation of the case and was present when the victim was interviewed at the Department of Children's Services. He identified the defendant in the courtroom and said that his appearance, including his "very short hair," was substantially similar to his appearance at the time of his arrest. On cross-examination, he testified that the victim was interviewed on the afternoon of September 20, 2004, and received a medical examination the following day.

Dr. Jeffrey Abrams, a pediatric emergency room physician, testified that he performed a medical examination on the victim on September 21, 2004, which included a pelvic examination using a colposcope or magnifying camera. He said that the victim had no external lesions, but he noted a slight redness of her hymen as well as a small notch at the 1:30 position and a "fairly significant size notch" at the 3:00 position. According to Dr. Abrams, notching signifies a prior tear or laceration that has healed, which is "indicative of prior trauma" and, depending on the size of the notch, indicative of "penetrating trauma, possible abuse." On cross-examination, he testified that he was unable to tell when or how the notching had occurred. He assumed that there would have been bleeding at the time of the trauma that resulted in the larger notch but could not be certain.

Following Dr. Abrams' testimony, the State rested its case-in-chief subject to the right to recall the victim, who had since returned to her kindergarten class, in response to a juror's question about her identification of the defendant. The trial court granted the defendant's motion to dismiss the aggravated sexual battery count of the indictment and the defendant then presented his proof, which consisted of the testimony of himself and his wife.

The thirty-two-year-old defendant testified that he had been married for almost twelve years and had three sons who were eleven, eight, and six years old. He said he had served six years in the United States Air Force and was employed as a jet engine mechanic at Standard Airlines in Maryville. During most of the time in which his wife babysat the victim, he was working the 7:00 a.m. to 3:30 p.m. shift and saw the victim only briefly when he came home for lunch or as she was

leaving with one of her parents when he arrived home at the end of his work day. On August 20, 2004, he had knee surgery, which required him to stay home from work until the middle of October. However, he rarely saw the victim during that period, as he spent most of his time in bed. The defendant testified that he wore a locking knee brace, used crutches, and required the assistance of his wife when getting out of bed or going to the bathroom. He said that he never touched the victim inappropriately and had no idea why she had made the allegations against him. He stated that his wife was the one who babysat her, and he had very little contact with the victim. On cross-examination, the defendant testified that he was never in charge of the babysitting and was never home alone with the victim.

The defendant's wife, Kimberly Torres, corroborated the defendant's testimony that he spent most of his time in bed following his knee surgery. She said that he was unable to stand without assistance, constantly wore a knee brace that kept his leg locked in a straight position, and was able to get around only on crutches. She stated that she was always at home when the victim and her brother were present and that she informed the victim's parents ahead of time whenever she had any appointments so they would know not to bring the children on those days. She testified that she never saw the defendant behave inappropriately toward the victim and had never known him to be inappropriate with any child. She said that the only problem she had with the victim during the time she babysat her was the victim's habit of removing her clothing. However, when she told the victim to put her clothes back on, she always complied. On cross-examination, Mrs. Torres reiterated that the defendant was never alone with the victim or her brother.

When called as a rebuttal witness and asked to stand up on the witness chair, the victim correctly identified the defendant, who had been moved from the defense table to a different position in the courtroom. On cross-examination, she testified that she had seen the defendant in the courtroom on the previous day as well. Asked if someone had told her that the defendant was "Oscar," she answered, "Yes," but when asked who had told her, she answered, "No one."

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the convicting evidence. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn.

-4-

Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In support of his contention that the evidence is insufficient to sustain his convictions, the defendant cites, among other things, the victim's sometimes inconsistent, confusing testimony; her initial inability to identify him as her abuser; his consistent denial of wrongdoing; and the lack of physical evidence linking him to the crimes. He points out that neither the victim's parents nor his wife noticed any bleeding from the victim or semen on her hair or clothing and that Dr. Abrams was unable to say when or how the notches to the victim's hymen occurred. The State responds by arguing that the evidence at trial, including the victim's graphic description of the rapes, her father's account of having found the defendant home alone with the children on several occasions, and Dr. Abrams' testimony that he found notches to the victim's hymen, was sufficient for the jury to find the defendant guilty of child rape. We agree with the State.

At the time the offenses occurred, rape of a child was defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Tenn. Code Ann. § 39-13-501(7) (2003).

Viewed in the light most favorable to the State, the evidence was sufficient for a rational jury reasonably to conclude that the defendant raped the victim by inserting his finger in her vagina and by having her perform oral sex on him. As the State points out, the victim described the rapes in graphic detail, testifying that the defendant touched her on the inside of her vagina with his finger, which hurt her, and that he put his penis in her mouth, telling her to "suck it like a baby bottle." She said that green "pee" came out of his penis into the sink, in her mouth, and on her hair, where it felt sticky, and that she pulled the "pee" out of her hair. Although she was unable to identify the defendant in the courtroom during her direct examination testimony, she was able to identify him

the following day when he had been moved from the defense table and she was allowed to stand on the witness chair. Moreover, she identified him in her testimony by his first name and by his relationship to her babysitter, Mrs. Torres.

Our supreme court has concluded that the testimony of a child victim, alone, is sufficient to sustain a conviction for child rape. State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003). Here, the victim's testimony was corroborated, at least in part, by her father's testimony that he arrived at the home on several occasions to find Kim Torres gone and the defendant babysitting the children alone, as well as the results of the victim's medical examination, which showed that she had sustained trauma at some point in the past that resulted in two notches to her hymen. The jury was entitled to disbelieve the testimony of the defendant and his wife that the defendant was never alone with the victim. As we have previously observed, the credibility of witnesses, the weight to be given their testimony, and the resolution of conflicts in the proof are within the province of the jury as the trier of fact. See Pappas, 754 S.W.2d at 623. We conclude, therefore, that the evidence is sufficient to sustain both of the defendant's convictions for rape of a child.

## II. Rebuttal Testimony from Victim

The defendant additionally argues that the trial court committed reversible error by allowing the State to present improper rebuttal testimony from the victim. The State argues that the defendant has waived this issue by failing to make a contemporaneous objection at trial and that the trial court acted within its discretion in allowing the testimony. We, again, agree with the State.

The challenged testimony occurred in response to a jury question submitted at the close of the State's proof, which inquired: "If possible, can the court re-ask the victim to identify her attacker? Given the stature of the victim it may be necessary for her to stand atop the witness box to see all persons in the court room." The prosecutor informed the trial court that the victim had returned to her kindergarten class and asked if the State could rest its case, subject to the right to recall the victim following the defense proof. Defense counsel raised no objection, asking only that he be allowed to seat the defendant at a different place in the courtroom from the defense table for the attempted identification. Thus, we agree with the State that the defendant has waived this issue by failing to make a contemporaneous objection at trial. See Tenn. R. App. P. 36(a) (providing that the failure to make a contemporaneous objection waives the issue on appeal).

Even if not waived, the issue is without merit. Questions concerning the admissibility of evidence generally rest within the sound discretion of the trial court, whose decisions will not be overturned on appeal absent a clear showing of an abuse of discretion. State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007). During the discussion of the issue at the close of the State's proof, the trial court observed that the victim could be called as a rebuttal witness at the close of the defense proof "to address this following testimony by the [d]efendant that he is not the person that did it." As previously noted, the defense raised no objection. The admission of rebuttal testimony lies within the discretion of the trial court. State v. Kendricks, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996).

We find no abuse of discretion by the trial court in admitting the evidence. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## **CONCLUSION**

We conclude that the evidence was sufficient to sustain the defendant's convictions for rape of a child and that the trial court did not err in admitting rebuttal identification testimony from the victim. Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE