# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 27, 2009 Session

## STATE OF TENNESSEE v. JOSHUA LYNN PARKER

**Appeal from the Circuit Court for Cocke County**
**No. 0177     Ben W. Hooper, III, Judge**

---

**No. E2008-02541-CCA-R3-CD - Filed September 22, 2010**

---

The Defendant, Joshua Lynn Parker, was convicted by a Cocke County Circuit Court jury of second degree murder, a Class A felony, and attempted rape, a Class C felony. See T.C.A. §§ 39-13-210 (1997) (amended 2006) (second degree murder); 39-12-101 (2006) (criminal attempt); 39-13-503 (2006) (rape). The Defendant was sentenced to serve thirty-five years years at 100 percent for second degree murder conviction and eight years at thirty-five percent for attempted rape conviction. The sentences were imposed to run consecutively. On appeal, the Defendant argues that (1) the evidence was legally insufficient to support his convictions; (2) the admission of hearsay statements by the victim violated his Confrontation Clause rights; and (3) testimony regarding his service on the "can crew," a work group of jail inmates, prejudiced him at his trial. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J, delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JAMES CURWOOD WITT, JR., J., filed a concurring and dissenting opinion.

Keith E. Haas, Assistant Public Defender, Newport, Tennessee, for the appellant, Joshua Lynn Parker.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; and Al Schmutzer, Jr., District Attorney General Pro Tempore, for the appellee, State of Tennessee.

**OPINION**

This case results from the April 8, 2003 attempted rape of the victim, 65-year-old Evelyn Lucy Lackey. Following a home invasion, the victim was treated and released from the hospital in the early morning hours of April 9, 2003. Law enforcement officers found her dead in her apartment later that afternoon. On December 14, 2006, a Cocke County grand jury indicted the Defendant on one count of attempted rape, one count of second degree murder, and one count of first degree felony murder. The second degree murder count was dismissed before the trial. The jury found the Defendant guilty of attempted rape and second degree murder as a lesser included offense of first degree felony murder.

**Pretrial Motions**

The State filed a motion asking the court "to allow into evidence the statements of the victim concerning the crime to her neighbor Fred Trentham, former Deputy Kevin Benton and Lindsey Ellison as an excited utterance." The State also made a motion to allow testimony about statements of Baptist Hospital of Cocke County nurses made for the purpose of medical diagnosis and treatment. The Defendant filed an opposing motion in limine arguing that the victim's statements were not excited utterances and noting the Defendant's inability to cross-examine the declarant, the deceased victim. Further, the Defendant argued, "[T]he statements at the ER should be limited to diagnosis and treatment only, not to causation or the factors leading up to said treatment." The Defendant also filed a motion in limine pursuant to Tennessee Rule of Evidence 609(a) to limit testimony referring to his participation on the "can crew."[1]

**A. Statements Made by the Victim to Neighbor, Sheriff's Deputy, and Emergency Medical Technician Responding to the Incident**

At the motion hearing, Kevin Benton of the Sheriff's Department testified that he was dispatched to the victim's home on the evening of April 8, 2003, and that he arrived at the victim's apartment, located at 492 Highway 160, within five minutes of receiving the dispatch. He explained that the building in which the victim lived housed an upstairs apartment and a downstairs apartment. Deputy Benton said that the victim lived in the downstairs apartment but that he reported to the upstairs apartment because the victim's neighbor Fred Trentham placed a 9-1-1 call.

---

[1] The State's brief explains, "The can crew apparently references a can collection program for inmates of the county jail, and the reference appears not to have been explained to the jury. Rather, the term seems to be commonly known in the trial court."

Deputy Benton testified that upon arriving at Mr. Trentham's apartment, he saw the victim with "a sheet or blanket wrapped around her." He described the victim as "real distressed," traumatized, and "definitely excitable." He testified that the victim first attempted to tell him about her assailant before she gave an account of the assault. The victim stated that she knew the assailant as having been to her house with her son, Johnny Lackey, and having worked with Mr. Lackey on the can crew. Although the victim was unable to provide the perpetrator's name, she said that he was wearing camouflage pants with a tear in the right leg, a white Dale Earnhardt racing tee shirt, and a baseball cap, which he left at the scene. She also stated that the assailant was five feet, nine inches tall and had long black hair and a goatee.

Deputy Benton testified that the victim told him that she answered a knock at her front door and that a man grabbed her and forced her into her bedroom at the back of the apartment. The victim told Benton that she saw another man sitting in a vehicle when she opened the door. She also told him that the man ripped off her pants and underwear. Deputy Benton stated that the victim reported that the perpetrator pushed her against a wall and that her head struck the wall. Benton said she told him that she was "struggling with [the assailant]" when "[h]e must have heard a noise because he got up and went to the front door . . . and looked out." Deputy Benton stated that the victim told him that she ran out of a side-entry door while the perpetrator was distracted and went upstairs to Mr. Trentham's apartment. The victim stated to Deputy Benton that the assailant never penetrated her sexually.

Deputy Benton testified that the victim remained excited during their entire conversation. He stated that emergency medical technicians ("EMTs") arrived during the conversation. He also said that he did not make a written report of the victim's statements at that time. He testified that he observed signs of a struggle in the victim's bedroom and that the victim's pants and underwear were lying next to her bed. He stated that he also observed a baseball cap on the bed, which he later obtained for analysis.

On cross-examination, Deputy Benton acknowledged that he wrote a report on April 17, 2003, about his investigation of the incident. He admitted that his written report did not contain any notation regarding the victim's statement that her head was struck during the attack.

Fred Trentham testified that he lived in the upstairs apartment on Highway 160. He stated that the victim had lived downstairs for "not quite a year" in April 2003. He testified that he occasionally spoke with the victim but did not know her well. He stated that he helped her with mowing and handyman work.

Mr. Trentham testified that on April 8, he heard a car pull up to the building and that five or ten minutes later he heard a "[r]eal urgent beating" at his back door. He said, "I opened the door and found [the victim] dressed in only a shirt and extremely scared to death." He said that the victim shook uncontrollably, that she was nude from the waist down, and that he gave her a sheet to cover herself. He said the victim told him she had been attacked, had been held down, and had escaped through the side door of her apartment when the perpetrator was distracted by a noise. He said that he heard a car drive away during his conversation with the victim.

Mr. Trentham testified that he called 9-1-1 and that Deputy Benton arrived five to eight minutes later. He said, "I'm not sure she was still that bad when the officers got there but I know as the evening or the time period went on, that she just gradually went into a shell and just got very quiet." He recalled that the victim seemed so upset when speaking with the officers that she could not remember her age. Mr. Trentam stated that the victim "kept saying that it was somebody on a can crew that her son knew."

On cross-examination, Mr. Trentham admitted that the victim never clarified how she knew the assailant and that he did not recall her stating that the assailant had visited her home previously. Mr. Trentham acknowledged that he heard the sounds of the vehicle coming and going because the apartment building was near the road and that he usually did not hear much traffic at night. He also stated that over the course of the victim's talking to the police and EMTs, "the more like it was sinking in and she was going into shock."

Lindsey Ellison testified that she worked on the EMT team in Cocke County in April 2003. She stated that she received a call to go to the victim's house at 9:29 p.m. and that she arrived at 9:35 p.m. She stated that, upon arriving at Mr. Trentham's apartment, she saw the victim wearing a green sweatshirt and wrapped in a sheet. Ms. Ellison described the victim as "really anxious and nervous." Ms. Ellison did not recall asking the victim any questions, and she said, "I think [the victim] just started telling us what happened, that somebody had [come into] the house."

Ms. Ellison testified that they took the victim to her apartment to dress to go to the hospital. Ms. Ellison noticed the victim's pants and underwear lying on the floor and a baseball cap lying on the bed. She testified that while in the victim's apartment, the victim told Ms. Ellison that "they came into the house to get some cigarettes and he sat on the couch and talked to her and then . . . went to the bedroom and stuck his hand inside her." On cross-examination, Ms. Ellison stated that she told the nurses upon arriving at the emergency room that the victim had been "touched and that she said that [the assailant] tried to choke her."

-4-

The Defendant conceded that the preliminary statements the victim made to Mr. Trentham before the police arrived were excited utterances. The trial court held that these statements were nontestimonial in nature under Crawford v. Washington, 541 U.S. 36 (2004). The court also held that the victim's statements to Deputy Benton fell within the excited utterance exception to the hearsay rule. After a lengthy analysis, the trial court held that the statements were nontestimonial even though they were made to a law enforcement officer. The court stated, "I never could come to the conclusion that [the victim] while she was standing there with a sheet wrapped around her was thinking about going to trial and being a witness . . . ." The court also noted that the victim's statements to Ms. Ellison were made while "[t]his woman was just terribly excited" and that her statements were nontestimonial. The trial court denied the Defendant's motion to suppress the victim's statements to any of these witnesses.

## B. Statements Made by the Victim to a Nurse at the Emergency Room

At the hearing, Melissa Cogdill, who was a nurse practitioner at Baptist Hospital of Cocke County in April 2003, testified that she spoke with the victim in the furtherance of her treatment. After her testimony, the State agreed "that the statements about the description of [the victim's] assailant would not be for diagnosis and treatment, and it should be excluded, but the other should be able to come in." Defense counsel agreed, and the court accepted the arrangement.

## C. References to the Defendant's Serving on the "Can Crew"

Defense counsel argued that any reference to the can crew would improperly expose the Defendant's criminal history to the jury. Counsel argued, "My client has certain constitutional rights that this jury doesn't know about his prior criminal history," and he suggested that the testimony be limited to revealing that the Defendant "was a friend of [the victim's] son" instead. The court determined that the testimony of the Defendant's serving on the can crew was not "terribly damaging." Further, the court noted that "[e]verybody wants to get on the can crew" and that it would reflect favorably upon the Defendant's jail time. During the trial, the trial court also admonished the jury not to make any inferences from the testimony involving the Defendant's serving on the can crew.

Trial

At the trial, Mr. Trentham testified that he had lived in his apartment on Highway 160, also known as "Bybee Highway," since 1995. He stated that he did not know the victim well but that he thought she was a "nice lady" and that he "tried to look out for her the best [he] could." He also explained that the victim had difficulty hearing. Mr. Trentham testified that the victim occasionally had visitors and that he did not remember if the victim drove.

Mr. Trentham's testimony of the April 8, 2003 incident closely followed that given in the motion hearing. He further explained that he sat with the victim during her initial conversation with the police officers and EMTs but that he did not go downstairs to the victim's apartment. He also testified that he could not see the make or model of the car that was parked outside the apartment. On cross-examination, he acknowledged that the victim did not know the name of her assailant, but he reiterated that the victim said the assailant knew her son from the can crew.

Ms. Ellison's trial testimony also closely followed that given during the motion hearing. In her trial testimony, she added that she observed red marks on the victim's throat. On cross-examination, she said she did not see Deputy Benton place the baseball cap found on the victim's bed into a sealed evidence container.

Deputy Benton testified that he was called to the victim's residence at 9:09 p.m. on April 8, 2003, and that he arrived at the apartment at 9:13. He testified that Deputy Eric Rinehart was his partner during the initial investigation. Deputy Benton's testimony about his investigation was consistent with his testimony during the motion hearing, although he did not testify at trial that the victim told him that the assailant struck her head against the wall. Deputy Benton said that the covers on the victim's bed were "tore up" and that items in the room looked as though they had been knocked out of place. Deputy Benton testified that he sealed the baseball cap found on the bed in an evidence bag and turned it over to a detective for further analysis.

Deputy Benton testified that based upon the victim's statements about the can crew, he went to the county jail to speak with the officer who oversaw the can crew. Deputy Benton obtained two photographs from the jail's files of men who had served on the can crew, although neither picture was of the Defendant. Deputy Benton showed the two pictures to the victim while she was recovering at the hospital. One picture was of Tim Bird, a Caucasian male with shoulder-length black hair and a moustache. The second picture was of a man with short dark hair and no facial hair. Deputy Benton said that the victim stated the photograph of Tim Bird looked more like the assailant than did the other photograph. Deputy Benton drove the victim home at 1:05 a.m. on April 9, 2003. He said he assured the victim that the premises were safe before he left.

On cross-examination, Deputy Benton explained that the files of the can crew were not computerized and that the photographs shown to the victim were what they could find by going through "folders." Deputy Benton admitted that he did not search for hair follicles at the crime scene and that he did not preserve the pants and underwear the perpetrator ripped off the victim. Deputy Benton also testified that he spoke with the victim's son, Mr. Lackey, who was an inmate at the county jail. He arranged a telephone call for Mr. Lackey to speak

with the victim while she was at the hospital. He also spoke with Mr. Lackey about the identity of other inmates on the can crew who the victim might know. Deputy Benton stated that he gathered names from Mr. Lackey and that "that's where [he] went and got some of pictures from [sic]." He testified that he did not retain the list of names or include the names in his report.

Ms. Cogdill testified that she served as a triage nurse for the victim on April 8, 2003, when the victim was admitted to Baptist Cocke County Hospital at 9:53 p.m. Ms. Cogdill read from her treatment notes, "Was attempted to be raped by son's friend, no sexual intercourse, but he tried with his hand and then he choked me." She testified that according to her notes, the victim had mild redness on her neck and complained of nervousness. Ms. Cogdill said, "[The victim] told us . . . that she opened the door because it was a friend of her son's and that he choked her, put her to the ground and then bent her legs up over her head." She said the victim also stated that the assailant removed her pants and that something must have distracted the assailant because he "ran off" and "wasn't successful at raping her."

Ms. Cogdill also served as the victim's primary nurse during her stay at the hospital. She testified that at 11:16 p.m. the victim complained of a headache and that Ms. Cogdill administered an adult dose of Tylenol. She said the victim claimed to feel better after taking the Tylenol. She reported that the victim was discharged from the hospital at 1:05 a.m. on April 9, 2003.

On cross-examination, Ms. Cogdill testified that she observed no external injuries to the victim except for the redness on her neck and that the victim did not report being struck in the head. Ms. Cogdill testified that no one ordered the performance of magnetic resonance imaging ("MRI") or computed axial tomography ("CAT") scans on the victim. She also stated that the victim reported that stress usually caused headaches.

The parties stipulated that Brian Murr of the Cocke County Sheriff's Department would testify that at approximately 2:30 p.m. on April 9, 2003, he went to the victim's home after receiving reports that the victim was not responding to attempted communication. After gaining entry to the home through the side door, he found the victim lying face down and apparently deceased. Deputy Murr transported the victim's body to the hospital where the Cocke County Medical Examiner pronounced the victim dead. The victim's body was then transported to Knox County for an autopsy.

Dr. Darinka Mileusnic-Polchan, Associate Professor of Pathology at the University of Tennessee Medical Center and acting Chief Medical Examiner for Knox County, testified that she performed an autopsy of the victim's body on April 10, 2003. She testified that the sixty-five-year-old victim was five feet, six inches tall and weighed ninety-eight and one-half

pounds, which included the weight of her clothing and the body bag. Dr. Mileusnic-Polchan testified that she did not observe any external signs of injury on the victim's body other than a small bruise on the bridge of the victim's nose. She also found no injury to the genital area or other evidence of penetration.

Dr. Mileusnic-Polchan testified that when she removed the victim's skull cap, she noticed blood pouring from the right side of the brain and discoloration of the dura. She explained that the dura surrounded the brain and that she observed blood trapped "between the hard covering of the brain and the brain itself." She referred to this injury as a "subdural hemorrhage." After cutting into the dura, Dr. Mileusnic-Polchan located a blood clot weighing between eighty and one hundred grams. She explained that the size of the blood clot would kill "even the healthiest" of adults and determined that the victim's death was caused by this subdural hemorrhage.

Dr. Mileusnic-Polchan testified that blood veins bridge the dura and the surface of the brain and that slow bleeding may develop in this area, ranging from a matter of hours to two days. She explained that the bleeding accumulates and causes pressure on the brain, causing the brain to swell and that eventually "the vital senses of the brain stem are pushed against the base . . . of the skull, that's the final mechanism of death."

Dr. Mileusnic-Polchan testified that she analyzed the blood clot to determine the "post-trauma aging of the blood clot." She estimated that the time period from when the victim received the hemorrhage to the time of her death ranged from twelve to twenty-four hours, "plus/minus an hour or two."

Dr. Mileusnic-Polchan also estimated the time of death of the victim as six to twelve hours before the Cocke County Medical Examiner's reported examination of the body at 5:00 p.m. on April 9, when the victim showed full rigor mortis. Based upon her observations of the lessening of the rigor mortis and the settling of the victim's blood, she estimated that the victim died between 1:00 a.m. and 8:00 a.m. on April 9, the morning the victim was released from the hospital.

Dr. Mileusnic-Polchan testified that it was mathematically impossible that the victim received the deadly injury after being released from the hospital. She said that in her expert opinion within a reasonable degree of medical certainty, the deadly injury occurred around the time of the sexual assault.

Dr. Mileusnic-Polchan testified that the trauma required to cause a subdural hemorrhage included "a blow, . . . a fall[,] and . . . any mechanism that is going to her head to perform a sudden deceleration." She explained that hitting a bed could be forceful enough

to cause subdural bleeding, but she maintained the force would have to be "relatively substantial." She said that subdural bleeding in the elderly required "a little bit less trauma than [in] younger people" but that "any household fall" would not cause this type of injury.

Dr. Mileusnic-Polchan testified that the initial symptom for a subdural hemorrhage would be a headache caused by the stretching of the dura. She explained that over-the-counter headache medicine would only alleviate the pain when the blood clot first started developing. She stated that the victim's 11:30 p.m. headache on April 8, which was alleviated by Tylenol, was consistent with the hemorrhage existing in its early stages.

On cross-examination, Dr. Mileusnic-Polchan admitted that the victim's life could have been saved had a MRI or CAT scan been performed at the hospital. She also stated that she did not see bruising or trauma around the victim's neck and that there were no signs the victim was choked.

Ronald Pruitt testified that he had known the Defendant for ten to twelve years and that he went with the Defendant to a home on Bybee Highway in April 2003. Mr. Pruitt stated that he drove his car, although he could not recall its make, model, or color. Mr. Pruitt stated that they went to the home "so [the Defendant] could borrow some money from somebody." He testified that they had been drinking alcohol and that he consumed more than a six-pack of beer.

Mr. Pruitt testified that after they arrived, the Defendant was gone for fifteen to twenty minutes. He said, "I think I went up and beat on the door and he [came] to the door and told me to get . . . back to the car, and when we went back to the car, I told him I needed to use the bathroom, but he just cussed and wanted me to go back to the car . . . ." Mr. Pruitt said that he relieved himself by the car and that the Defendant later returned to the car and demanded to drive. He said he gave the Defendant directions to the "lake bottoms" and that he left the Defendant there. Mr. Pruitt identified a photograph of the victim's apartment building as the place where he went with the Defendant.

On cross-examination, Mr. Pruitt testified that he believed that it was daylight when he and the Defendant went to the victim's apartment. He said he spoke with Detective Robert Caldwell in late April 2003 and again a year or two later. He admitted that he did not tell Detective Caldwell about going to the home on Bybee Highway in the April 2003 conversation. Mr. Pruitt stated that he sustained a brain injury in a car accident twenty-four years earlier, which caused his thinking and memory to be slow. On redirect-examination, Mr. Pruitt stated that when he spoke to Detective Caldwell the second time, he told him the same facts to which he testified at trial.

Mr. Lackey, the victim's son, testified that he knew the Defendant and that he knew Mr. Bird, the man whose photograph the victim identified at the hospital. He said he had been on the can crew with both men. He said the victim met the Defendant but not Mr. Bird.

On cross-examination, Mr. Lackey testified that the victim visited him during the time he was on the can crew. He said she visited when the crew began work in the mornings and when they returned to the jail for lunch. He said she often brought him money and cigarettes. He agreed many members of the can crew had contact with the victim during his time on the crew, from January 2002 to 2003. Mr. Lackey said his mother moved into the Bybee Highway apartment about ten months before she died. He stated that even though the can crew worked along a route that passed his mother's apartment, he never informed any of the other can crew members that his mother lived there.

Detective Robert Caldwell of the Cocke County Sheriff's Department testified that after he received a telephone report of a suspicious death on Bybee Highway, he went to the apartment and observed a body face-down on the floor. He said that officers transported the body to Cocke County Baptist Hospital.

Detective Caldwell testified that the next day, Deputy Benton gave him a baseball cap sealed in a plastic bag. He said he put the sealed plastic bag into a paper bag, which he gave to Agent Derek Newport of the Tennessee Bureau of Investigation ("TBI") for analysis. Detective Caldwell testified that after the victim identified Mr. Bird's picture, Mr. Bird became the focus of his initial investigation. He stated that he changed the focus of his investigation to the Defendant after he received a telephone call from an anonymous male caller.

Detective Caldwell testified that when he initially interviewed Mr. Pruitt in April 2003, Mr. Pruitt did not say that he went to the victim's apartment with the Defendant. Detective Caldwell said that when he spoke with Mr. Pruitt on July 28, 2003, Mr. Pruitt stated that he took the Defendant to the victim's apartment. He said that Mr. Pruitt directed him to the victim's apartment.

Detective Caldwell testified that he obtained a consensual blood sample from the Defendant on July 1, 2003, which was forwarded to the TBI for analysis. He also stated that he took buccal swabs from Mr. Pruitt and Mr. Bird. He said the Defendant and Mr. Bird were similar in appearance, and he displayed two side-by-side photographs of the men.

On cross-examination, Detective Caldwell admitted that he did not obtain the buccal swabs from Mr. Pruitt or Mr. Bird until three and one-half years after the victim's death. Detective Caldwell acknowledged that Mr. Pruitt claimed to have given a different version

of events in his second interview because the Defendant had beaten him after his first interview.

On redirect-examination, Detective Caldwell stated that Mr. Pruitt told him that in April 2003, he and the Defendant went to the victim's house at night. He maintained that it was not until a week before the trial that Mr. Pruitt stated that it was daylight when the men went to the apartment.

The parties stipulated that Harvey Holt would testify that he leased the Bybee Highway apartment to the victim starting in July 2002. The rental agreement was received as evidence.

The parties also stipulated that Agent A.R. McCall of the TBI would testify that he received the Defendant's blood samples from Detective Caldwell and delivered them to pilot Greg Elliot. The parties stipulated that Greg Elliot would testify that he transported the blood samples to Agent Michael Turbeville at the TBI Crime Laboratory in Nashville.

TBI Special Agent Derek Newport testified that he assisted in the investigation of the victim's death. He testified that he transported the sealed bag containing the baseball cap to Nashville for analysis on May 6, 2003. He also testified that he transported the buccal swabs from Mr. Pruitt and Mr. Bird to the TBI Crime Laboratory in Nashville. He stated that he and Detective Caldwell interviewed Mr. Pruitt on May 9, 2005, and that he took notes of the interview.

Special Agent Michael Turbeville, a forensic scientist at the TBI Crime Laboratory, testified as an expert in serology and deoxyribonucleic acid ("DNA"). He analyzed the Defendant's blood, the buccal swabs of Mr. Bird and Mr. Pruitt, and the baseball cap. Agent Turbeville testified that he cut a sample from the sweat band inside the cap and developed a "partial DNA profile" from it. He said that he was only able to develop four of the possible thirteen locations, although he noted that an examination of four locations "is still enough to generate a statistic." He said that he compared the Defendant's DNA profile to the partial profile from the cap and that the four locations were an "exact match." He described the Defendant's DNA profile as "consistent" with that found on the baseball cap. He said that if he used a less reliable, lower threshold in his examination, the Defendant's profile was consistent with two more locations from the sample's profile. He said that using the lower threshold also allowed him to identify trace amounts of another individual's DNA on the cap.

Agent Turbeville testified that he excluded both Mr. Bird and Mr. Pruitt as contributors of the DNA on the cap. He said that this result would not change if the lower threshold were used. Agent Turbeville concluded, "In the Caucasian population, you would

expect to find those four markers . . . the exact profile in the general population, one in 85,320 events," which he said "essentially exclude[d]" 99.9 percent of the general world population.

In the Defendant's case-in-chief, Janie Littleton testified that she worked at a flower shop near the jail. She said she knew the victim from the victim's daily jail visits with the victim's son. She said, "[The victim] would be there when the can crew went out and she would be there when they [came] back and that she would be there when they went out that evening and [came] back, just so she could see him." She recalled that the victim had little money to buy things for her son.

Ms. Littleton testified that on occasions when the victim did not come to the jail as usual, she called the victim's home to check on the victim. She said that the victim also called her. She said that the victim did not come to the jail on the morning of April 8, 2003. Telephone records received as stipulated evidence showed that the victim last called Ms. Littleton at 6:55 p.m. on April 8, 2003.

Ms. Littleton testified that the victim spoke with anyone she saw on the streets when she came to the jail but that the only people on the can crew with whom the victim spoke were the victim's son and another man that the victim called "Doodlebug or something." Ms. Littleton did not know whether the victim spoke with the Defendant because she "didn't usually go out with [the victim]."

On cross-examination, Ms. Littleton agreed that the victim was frail and "wasn't big enough for nothing." She said that she spoke with law enforcement officers on April 17, 2003, and told them that the victim did not answer her telephone on April 9.

The parties stipulated that the victim's eighty-four-year-old friend, Callie Shelton, made the last successful telephone call to the victim's home. The parties stipulated that Ms. Shelton's grandson, Charles David Sutton, sometimes delivered drinking water and produce to the victim's house as a favor to Ms. Shelton.

Janice Sexton, jail administrator in Cocke County, testified that she worked at the jail from 1996 to 2002 and resumed employment there in 2007. She testified that Cocke County did not use a computer for its jailing records until 2004. She stated that before 2004, they used Polaroid film to take pictures of the inmates for their individual files but that the jail currently used digital files and photographs for the inmates. She said the county did not always have the funds for Polaroid film. She explained that handwritten rosters were used to account for the inmates. Ms. Sexton testified that a few weeks before trial, Detective Caldwell located a Polaroid photograph of the Defendant in the jail's files.

Charles Randall Parker testified that the Defendant was his nephew and lived at his home in April 2003. Mr. Parker stated that his girlfriend and her daughter lived with him. Mr. Parker testified that in April 2003, Detective Caldwell visited his home and asked for any of the Defendant's baseball caps. Mr. Parker said that he gave two grocery bags filled with hats to Detective Caldwell and that Detective Caldwell returned them a few days later. He testified that he could not recall if the Defendant owned any NASCAR hats and that he did not know if Detective Caldwell returned all of the hats. Mr. Parker also testified that he was the only person who did laundry in the home and that the Defendant did not own a Dale Earnhardt tee shirt.

On cross-examination, Mr. Parker admitted that he did not want the Defendant to be convicted. He also explained that the Defendant wore several baseball caps and that he could not remember whether the Defendant had a NASCAR cap with Jeff Gordon's name on it.

Detective Caldwell testified as a rebuttal witness that Mr. Parker's statement that the detective took baseball caps from Mr. Parker's home was "an absolute lie." Detective Caldwell admitted that he went to the home to investigate but not that he took any hats.

The jury found the Defendant guilty of attempted rape and second degree murder. The trial court sentenced the Defendant to serve thirty-five years as a violent offender for the second degree murder conviction and imposed a consecutive eight-year sentence as a multiple offender for the attempted rape conviction.

**I**

The Defendant contends that the evidence identifying him as the perpetrator was insufficient to support his convictions and that the evidence of a "knowing" mens rea was insufficient to support the second degree murder conviction. The State contends that the evidence supports the convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but we must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, to warrant a criminal conviction on circumstantial evidence alone, the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of guilt." Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). While following these guidelines, we must note that the jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marabel v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611).

It is unlawful to attempt to sexually penetrate a victim by use of force or coercion. T.C.A. § 39-13-503(a)(1); id. § 39-12-101. The Defendant does not challenge the sufficiency of the proof of the elements of the offense, only the jury's identification of him as the man who committed the attempted rape. The victim stated that her attacker served on the can crew with her son. The evidence showed that the Defendant served on the can crew with the victim's son and that the victim visited her son during the time he was on the can crew with the Defendant. Although the victim stated that Mr. Bird's picture most closely resembled her attacker, the jury viewed with side-by-side photographs of Mr. Bird and the Defendant, and the jury assessed the similarity of the men's appearances. Mr. Pruitt testified that he was outside the victim's home with the Defendant in April 2003 and that the Defendant went inside the home alone. He testified that after fifteen or twenty minutes, the Defendant hurriedly returned to the car. The assailant left a baseball cap at the scene, and DNA testing of the cap excluded other suspects and matched the Defendant's DNA profile at four of thirteen locations. Agent Turbeville testified that this DNA profile occurred in one of every 85,320 events in the Caucasian population and excluded 99.9 percent of the world's population.

The circumstantial proof of the DNA test results, the victim's identification of her attacker as someone who worked on the can crew with her son, and Mr. Pruitt's placement of the Defendant at the crime scene are consistent with the Defendant's guilt and are sufficient to exclude every reasonable theory other than the Defendant's identity as the perpetrator. We hold that the evidence sufficiently supported the jury's conviction of the Defendant for attempted rape.

Next, we consider the Defendant's conviction of second degree murder. The Defendant argues that the evidence failed to show that he committed a "knowing" killing as a result of a sexual assault of the victim. The State disagrees and counters that proving the

knowing element was not required because the evidence was sufficient to support the charged offense of felony murder. We agree with the State.

The Defendant was indicted for one count of first degree felony murder and one count of second degree murder. Although the record does not contain an order dismissing the second degree murder count, we conclude that this count was dismissed before trial because the trial court instructed the jury on second degree murder as a lesser included offense of felony murder, rather than as a separate count of the indictment. The verdict form reflects that the jury acquitted the Defendant of felony murder and instead convicted him of second degree murder as a lesser included offense of felony murder.

As relevant here, the charged offense, first degree felony murder, involves a defendant's committing a predicate crime and causing a death resulting from the commission of that crime. See T.C.A. § 39-13-202(2). The conviction offense, second degree murder, is the "knowing killing of another." T.C.A. § 39-13-210. Second degree murder is a lesser included offense of felony murder. See State v. Ely, 48 S.W.3d 710, 721 (Tenn. 2001). The trial court had the duty to instruct the jury on any lesser offense included within the greater under the framework of State v. Burns, provided the proof supported the charge. Ely, 48 S.W.3d at 722 (citing State v. Burns, 6 S.W.3d 453, 467 (Tenn. 1999)).

We agree with the Defendant that the proof did not establish a knowing mens rea for the victim's murder. Thus, the trial court should not have instructed the jury on that offense. We note, however, that the facts found by the jury in convicting the defendant of attempted aggravated rape and second degree murder were sufficient to support a finding beyond a reasonable doubt that the Defendant committed felony murder. Thus, we must determine whether the conviction of the lesser included offense can survive despite the deficient proof of its elements. For the reasons that follow, we answer that question affirmatively. Judge Witt, for reasons explained in the dissenting opinion, disagrees.

In State v. Mellons, 557 S.W.2d 497, 498 (Tenn. 1977), the supreme court upheld the defendant's conviction of voluntary manslaughter, even though no proof existed that the defendant committed the killings "upon a sudden heat." The defendant had been charged with second degree murder, and the trial court instructed the jury on that offense and on voluntary manslaughter, despite the deficient proof of the latter offense. Recognizing the trial court's error, the supreme court said:

> [T]he giving of such an instruction, even though it results in conviction of a lesser included offense not supported by the evidence, though error, is not necessarily reversible error. On appeal, a conviction of a lesser degree of the crime charged, or

-15-

of a lesser included offense, will be upheld, even if there is no evidence in the record to establish the technical elements of that crime, if the evidence demands a conviction of a higher degree of homicide than that found by the verdict, and there is either no evidence in support of acquittal of the greater crime, or if there is, the verdict of the jury clearly indicates that the evidence in support of acquittal was disbelieved, on the theory that the defendant was not prejudiced by the charge and the resulting verdict. See Reagan v. State, 155 Tenn. 397, 293 S.W. 755 (1927); Craig v. State, 524 S.W.2d 504 (Tenn. Cr. App. 1975); Howard v. State, 506 S.W.2d 951 (Tenn. Cr. App. 1973). See also 102 A.L.R. 1019, 1026; 4 WHARTON'S CRIMINAL PROCEDURE § 545 at 29-30 (12th ed. Torcia 1976).

Mellons, 557 S.W.2d at 498.

More recently, this court relied on Mellons to hold that a conviction of attempted voluntary manslaughter did not require reversal when the proof would have supported findings of guilt for either attempted first degree murder or attempted second degree murder, even though insufficient proof existed of the provocation element of voluntary manslaughter. State v. Jeffery Lee Mason, M2002-01709-CCA-R3-CD, Giles County, slip op. at 5-6 (Tenn. Crim. App. May 19, 2004) (Hayes, J., dissenting), perm. app. denied (Tenn. Nov. 15, 2004). This holding is in accord with other decisions. See State v. Smith, 695 S.W.2d 527, 529 (Tenn. 1985) ("[T]he rule of State v. Mellons . . . applies, that defendant will not be heard to complain of conviction of a lesser included offense when he could have been convicted of a higher degree of homicide."); State v. Davis, 751 S.W.2d 167, 169-170 (Tenn. Crim. App. 1988) (sufficient evidence of first degree murder supports conviction of voluntary manslaughter); State v. Clay B. Sullivan, No. M2004-02068-CCA-R3-CD, slip op. at 5-6 (Tenn. Crim. App., Nashville, March 10, 2006) (sufficient evidence of attempted first degree murder supports conviction for facility of attempted voluntary manslaughter); see also State v. Cook, 816 S.W.2d 322, 324 (Tenn. 1991) (stating that a jury's convicting a defendant of a lesser included offense "has historically been sanctioned by our appellate courts even where there was no evidence to establish the technical elements of the lesser offense found if the evidence supported conviction of a higher crime").

We acknowledge that an issue of this nature has arisen in the context of voluntary manslaughter convictions in which adequate provocation was not shown despite sufficient proof of the greater offense. We note that our supreme court called the adequate provocation requirement a separate element. See State v. Trusty, 919 S.W.2d 305, 311 (Tenn. 1996), overruled on other grounds by State v. Burns, 6 S.W.3d 453 (Tenn.1999). Perhaps it is time

-16-

to review whether passion upon adequate provocation should be considered a part of a lesser included mens rea, not a separate element. However, that issue is not before the court in this appeal.

Our supreme court has said with respect to the specific offenses involved in the case at bar:

> When comparing the offense of felony murder to the lesser homicide offenses, it is immediately apparent that one accused of felony murder is held to a higher level of culpability, as felony murder is considered the more serious offense and merits a more severe punishment than either second degree murder, reckless homicide, or criminally negligent homicide. In other words, when a death results from the commission of, or the attempt to commit, a felony, the mental state required for the commission of the felony is deemed a more culpable mental state than knowledge, recklessness, or negligence.

Ely, 48 S.W.3d at 721. Thus, the knowledge element of second degree murder is satisfied by the Defendant's greater mental culpability for the sufficiently proven felony charged in the felony murder count.

As applied to the facts of the present case, the evidence was sufficient to prove that the victim died as a result of the Defendant's attempt to commit aggravated rape. Thus, the State proved a culpable mental state, which exceeded the threshold of the "knowing" element of second degree murder. The proof therefore supports the Defendant's conviction. Cf. State v. Alfred Turner, No. W2007-00891-CCA-R3-CD, Shelby County (Tenn. Crim. App. June 22, 2010) (relying on Mellons and Davis to affirm the defendant's conviction of facilitation of second degree murder and facilitation to commit first degree murder based upon sufficient proof of the greater offenses of first degree premeditated murder and first degree felony murder, despite proof that the defendant committed the crimes alone, rather than that he facilitated another person's criminal activity).

**II**

The Defendant contends that the trial court erred in admitting testimony about the victim's statements. The Defendant argues that the statements were inadmissable hearsay and that admission of these statements violated his constitutional right to confront the witnesses against him. We review de novo a defendant's claim of violations of the right to confront witnesses. State v. Lewis, 235 S.W.3d 136, 141-42 (Tenn. 2007). We also review

the underlying hearsay issue de novo. State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008).

Both the state and federal constitutions guarantee the criminal accused the right to confront the witnesses against him. Although the provisions are not entirely coextensive, our supreme court has concluded that "there is no reason to interpret" the state and federal guarantees differently when considering Confrontation Clause claims. Lewis, 235 S.W.3d at 144. The Confrontation Clause affords "'two types of protection for criminal defendants: the right to physically face the witnesses who testify against the defendant, and the right to cross-examine witnesses.'" Id. at 142 (quoting State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996)).

In Crawford v. Washington, the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." Crawford, 541 U.S. 36, 68 (2004). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ." Id. Thus, Crawford "bars the admission of testimonial hearsay absent a showing of unavailability and a prior opportunity for cross-examination." Lewis, 235 S.W.3d at 146.

Although the United States Supreme Court has not provided a complete explanation of what differentiates "testimonial" hearsay from "nontestimonial" hearsay, our supreme court has adopted the following non-exhaustive list of factors:

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

State v. Maclin, 183 S.W.3d 335, 349 (Tenn. 2005). Statements describing past events to law enforcement officers are testimonial, but when statements to law enforcement officers are meant to assist the officers in meeting an ongoing emergency, such statements are

-18-

nontestimonial.  <u>Lewis</u>, 235 S.W.3d at 146 (citing <u>Davis v. Washington</u>, 547 U.S. 813, 822 (2006)).

Even if nontestimonial, the statements must comport with our hearsay rules. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." <u>Id.</u> 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. We review the trial court's admission of hearsay on a de novo basis. See <u>Gilley</u>, 297 S.W.3d at 759-61.

**A.**

The Defendant's first challenge is to Fred Trentham's retelling of the victim's statements, which he argues were testimonial and therefore inadmissible. The evidence showed that the victim, after entering Mr. Trentham's apartment while "scared to death" and "dressed in only a shirt," recounted to Mr. Trentham that she had been attacked by a man who worked with her son on the can crew. Further, Mr. Trentham's testimony suggested that the victim feared that her assailant remained in her apartment. We hold that the hearsay statements were nontestimonial. The victim was speaking to her neighbor directly after escaping an attack, and there was no indication she expected the statements to be used in the investigation or prosecution of her attacker.

The question becomes whether the Rules of Evidence allowed this hearsay to be admitted at trial. See <u>Crawford</u>, 541 U.S. at 68. The Defendant conceded in the motion hearings that the victim's statements fall within the hearsay exception for excited utterances. *See* Tenn. R. Evid. 803(2). We agree.

**B.**

Regarding the statements made by the victim to Deputy Benton, the proof showed that Deputy Benton arrived at the scene approximately five to eight minutes after receiving the 9-1-1 call from Mr. Trentham, and upon the deputy's arrival, the victim informed him of <u>past</u> events. At this point, nothing indicated that the victim's description of the assailant related to an ongoing emergency. Further, the victim's statements to Deputy Benton paralleled what she told Mr. Trentham before the law enforcement officers arrived, although the victim added detailed descriptions of the Defendant, including his height, appearance, and clothing. These descriptive factors indicate that the victim was providing Deputy Benton with information for further investigation.

This case is factually similar to <u>State v. Lewis</u>, in which the victim owned and operated an antique store. <u>Lewis</u>, 235 S.W.3d at 139. Employees of a neighboring business

-19-

heard "several loud crashes" and investigated the antique store. Id. They observed the victim severely injured with a bullet wound. Id. The victim then described his assailant to the employees and asked them to call 9-1-1. Id. A detective came to the scene and spoke with the "blood[-]soaked" victim, who gave more descriptions regarding the identity of the assailant. Id. at 139-40. The victim later died of the gunshot wounds. Id. at 139. Our supreme court determined that the statements given by the victim to the detective were testimonial pursuant to Crawford and its progeny. Lewis, 235 S.W.3d at 147. The court stated:

> While the victim's statements here took place at the crime scene, they were responses to inquiries by the investigating officers. Even though the victim was in a state of distress from his wounds, his comments did not describe an 'ongoing emergency,' as defined in Crawford, and were instead descriptions of recent, but past, criminal activity . . . .

Id. Ultimately, the supreme court held that the evidence was admissible as a dying declaration, "an evidentiary rule which has thus far survived Crawford and its progeny." Lewis, 235 S.W.3d at 151.

The present case involves an excited utterance, not a dying declaration. In Maclin, the supreme court held that excited utterances are not per se nontestimonial and that whether an exited utterance is testimonial is determined after reviewing the totality of the circumstances. See Maclin, 183 S.W.3d at 351. In this case, the victim spoke with her neighbor before the police arrived. When she later spoke with Deputy Benton, she was recounting past events and providing information to help identify the assailant. In light of our high court's ruling in Lewis, we hold that the victim's statements were testimonial.

The State argues that the victim's responses to Deputy Benton's questioning were nontestimonial because they were not made in a "formal interview." The United States Supreme Court contemplated the possible issues in restricting all testimonial hearsay to products of interrogation. See Davis, 547 U.S. at 822 . Despite its holding in Davis that the responses to the interrogation were testimonial, the high court noted, "This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation." Id. Upon consideration, we hold that the victim's statements to Deputy Benton, who was present for investigative purposes, were testimonial.

We next consider whether the State made a "showing of unavailability and a prior opportunity for cross-examination." Lewis, 235 S.W.3d at 146; see Crawford, 541 U.S. at 68. By virtue of her death, the victim was unavailable for trial and could not be cross-examined. The victim died long before law enforcment's investigations led to the Defendant's indictment. The trial court committed constitutional error in admitting Deputy Benton's testimony about the victim's statements identifying her attacker and describing the attack, even if the statements were Rule 803(2) excited utterances.

We must consider next whether the trial court's error requires reversal. If an error is constitutional in nature, there must be a reversal unless the error is harmless beyond a reasonable doubt. Cauthern v. State, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004) (citing State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)).

The admissible statements made by the victim to Mr. Trentham and to Deputy Benton were similar. The only additional information the victim gave Deputy Benton were descriptions of the assailant as a five-feet, nine-inches tall white male and of his attire. Although these statements aided Deputy Benton and Detective Caldwell in identifying the Defendant, this proof was not unduly prejudicial given the admissible testimony of Mr. Trentham about the identity of the Defendant and the body of convicting evidence. We hold that the trial court's error was harmless beyond a reasonable doubt. See T.R.A.P. 36(a); Cauthern, 145 S.W.3d at 600.

**C.**

The Defendant also challenges the testimony of Lindsay Ellison, the EMT who spoke with the victim, which the trial court admitted under the excited utterance exception to the hearsay rule. See Tenn. R. Evid. 803(2). We note, however, that defense counsel waived our consideration of this issue by failing to preserve this issue in the motion for new trial. See T.R.A.P. 3(e); State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (holding that on direct appeal from jury trial, any issue, other than sentencing, the meritorious consideration of which does not result in a dismissal of the charges, must be raised in a motion for new trial to preserve the issue for appellate review).

**D.**

The Defendant also challenges Ms. Cogdill's testimony that the victim stated while she was being treated at the emergency room that her son's friend attacked her. The record reflects that the victim made these statements outside of the presence of law enforcement personnel and that these statements were made in furtherance of her medical treatment. We hold that these statements were nontestimonial. See State v. Cannon, 254 S.W.3d 287, 304 (Tenn. 2008) (holding that rape victim's statements to emergency room personnel about the rape were nontestimonial); see also Melendez-Diaz v. Massachusetts, --- U.S.----, 129 S. Ct.

2527, 2533 n.2 (2009) ("[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today.").

Next, we must determine whether this nontestimonial hearsay was properly admitted under the Rules of Evidence. The Defendant argues that the identity of the attacker was not admissible as a hearsay exception for statements made for medical diagnosis and treatment. See T.R.E. 803(4). The Defendant argues that Ms. Cogdill's statement exceeded the scope of Rule 803(4) when she stated that the victim reported that her son's friend attacked her.

Before trial, the State and defense counsel agreed that only the portions of the victim's statements at the emergency room directly related to her treatment would be admitted. The parties agreed to exclude statements related to the identity of the attacker. However, at trial, the prosecutor asked Ms. Cogdill what the victim told her at the hospital, and she responded, "Was attempted to be raped by son's friend . . . ." The defense did not object, although the issue was raised in the motion for new trial. Without determining whether the Defendant waived the issue by failing to object contemporaneously, we hold that any error in admitting this evidence was harmless. The jury had already heard Mr. Trentham's testimony that the victim "kept saying that it was somebody on a can crew that her son knew." The evidence in question did not add any new information. See T.R.A.P. 36(b).

### III

Finally, the Defendant contends that the trial court erred in denying his motion in limine to limit testimony about the Defendant's serving on the "can crew" or being a jail inmate. He argues that permitting such evidence violated Tennessee Rules of Evidence 404 and 609(a). The State contends that the prejudice from this evidence did not outweigh its probative value, and we agree.

Tennessee Rule of Evidence 404 restricts the use of "other crimes, wrongs, or acts" to prove character of the Defendant and his propensity to act in conformity with such a trait. The State did not introduce any evidence of the Defendant's prior criminal activity. Although the "can crew" references necessarily imply that the Defendant was serving jail time for some reason, this information was never exploited to prejudice the Defendant. There was no proof of a record of conviction or statement of past crimes. The trial court admonished the jury not to consider this evidence against the Defendant. In any event, even if this were viewed as propensity evidence, the probative value of the evidence, which was necessary to identify the perpetrator, outweighed any prejudice. See Tenn. R. Evid. 404(b)(4).

We likewise reject the Defendant's assertion that this was impeachment by evidence of conviction of a crime pursuant to Tennessee Rule of Evidence 609(a). As noted, no proof of a conviction was introduced. The references to the can crew were not intended to impeach the Defendant, and the trial judge gave curative instructions about the limits of the use of this evidence. Further, Rule 609 addresses using a conviction to impeach a testifying witness, and the Defendant did not testify in this case. See Tenn. R. Evid. 609(a).

Upon review of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE