IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2026

**STATE OF TENNESSEE v. STEPHEN DAVID STERLING**

**Appeal from the Circuit Court for Williamson County**
**No. M-CR210402   Deana C. Hood, Judge**
_____

**No. M2025-00449-CCA-R3-CD**
_____

The Defendant, Stephen David Sterling, appeals from the trial court's reinstatement of his original sentence in confinement following the revocation of his probation, arguing that the trial court abused its discretion in denying his request to enter an intensive residential drug and alcohol treatment program.  Based on our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

Greg Burlinson, District Public Defender, Richard C. Strong, Assistant Public Defender, Franklin, Tennessee, for the appellant, Stephen David Sterling.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy Assistant Attorney General; Stacey Edmonson, District Attorney General; and Jennifer Dugan, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In December 2019, the Defendant pled guilty in case number W-CR190502 in Williamson County Circuit Court to aggravated stalking and violation of an order of protection and received a two-year sentence in the Tennessee Department of Correction, suspended to supervised probation.  The victim in the case was Jennifer Richter.

On August 30, 2021, the Defendant pled guilty in case number M-CR210402 in Williamson County Circuit Court to especially aggravated stalking, a Class C felony, based on his having placed multiple phone calls to Ms. Richter after being convicted of aggravated stalking in case number CR190502. Pursuant to his negotiated plea, he was sentenced to six years in the Tennessee Department of Correction, suspended to supervised probation. In addition to the standard rules of felony probation, the Defendant was ordered to enter and successfully complete the Tennessee Recovery Oriented Compliance Strategy ("TN-ROCS") program and all its aftercare recommendations and to have no contact with the victim, the employees of a pharmaceutical company, or the employees or customers of the pharmaceutical company.

On October 21, 2024, a probation violation warrant was filed alleging that the Defendant violated the terms of his probation in the especially aggravated stalking case by his August 29, 2024 arrest in Nashville for domestic assault with bodily injury and violation of an order of protection. The alleged victim of the domestic assault was the Defendant's wife, Daun Bauman.

Ms. Bauman, called by the State, was the only witness at the Defendant's probation revocation hearing, which occurred on November 4, 2024, February 3, 2025, and March 3, 2025. Ms. Bauman began by acknowledging her addiction to alcohol and testifying that she had 60 days of sobriety as of the date of the November 4 hearing. She stated that she met the Defendant in June 2023 in San Diego at the treatment center where she worked as a nurse and the Defendant was a patient. She said she moved to Nashville, and in with the Defendant, at the beginning of May 2024 "[t]o get and stay sober." She testified that she and the Defendant were not in a romantic relationship when she first moved to Nashville but began one that month. According to her testimony, her relationship with the Defendant was "[a]mazing" in the beginning, and she married the Defendant on July 22, 2024.

Ms. Bauman testified that she and the Defendant were both sober at the time they married. She said she had relapsed "just a little bit" on two occasions in the week prior to the assault, and that the Defendant "relapsed pretty badly on alcohol" on August 23, 2024, the day of the assault. She testified that when she got home that day from her job as an intake coordinator at a mental health facility, the Defendant wanted to go to a bar on Broadway, and she agreed.

Ms. Bauman testified that the Defendant drank alcohol on the way to the bar and had two double shots of Jack Daniels whiskey at the bar, while she had two shots of tequilla. The Defendant was very intoxicated, and she ordered a Lyft ride and helped the Defendant outside. The Defendant, however, did not want to go. The Defendant was grabbing her face, and police officers outside the bar asked the Defendant "to tone it down"

and told her to "just go" when the Lyft driver arrived. She did as the officers suggested, taking the Lyft home by herself and leaving the Defendant behind in downtown Nashville.

Ms. Bauman testified that the Defendant arrived home by cab at approximately 11:30 p.m. and told her to pay the driver. She stated that she paid the cab driver and returned to the house, where she and the Defendant exchanged words before the Defendant grabbed her by her hair. She lost consciousness, due, she believed, to the Defendant's having "slammed [her] head or something[.]" The next thing she remembered was getting up off the floor and telling the Defendant that she was calling 911. At that point, the Defendant grabbed the phone from her hand and struck her on the left jaw with his closed fist, knocking her unconscious for a second time. She next recalled beating at the locked bedroom door and seeing blood flowing from her head. She said that the Defendant eventually let her inside their bedroom, and she and the Defendant both went to sleep.

Ms. Bauman testified that she believed the Defendant kicked her with his boots while she was unconscious. She based that belief on the bruise and broken skin she later found on her left breast, and on the fact that there were no objects in the living room that could have caused the laceration on her head.

Ms. Bauman testified that she reported the assault to the police the following Thursday, August 29, 2024. She had little memory of Saturday, August 24, other than having received a few text messages. On Sunday, August 25, she remained in bed. That night, she received a phone call from her best friend in San Diego. The Defendant asked for her passcode to answer the call, and she overheard the Defendant say to her friend: "I'm going to make her gone."

Ms. Bauman testified that her friend called to request a welfare check. Ms. Bauman recalled having spoken to police officers at the house that Sunday night but could not recall what she told them. She did recall that the police officers took the Defendant to a downtown hotel that night. She stated that she had no means to leave the house because the Defendant had her car keys and had turned off her access to her debit card.

Ms. Bauman testified that the Defendant returned home on Monday at about 1:00 p.m., slept, and then went to work. She said she stayed in bed the entire day. On Tuesday, August 27, she went to an appointment with her psychiatrist. She stated that she told the Defendant that she needed medical attention, but he begged her not to go to the emergency room because it would result in his probation violation. Because she did not want to make matters worse than they already were, she came home. When she got home, she was so lightheaded and dizzy that she had to hang onto a post for support when she went outside to smoke a cigarette, and by that afternoon she was violently vomiting.

Ms. Bauman testified that she went to work on Wednesday, but her left ear was ringing, and she was having difficulty pronouncing words. When she got home that evening, the Defendant "got incredibly intoxicated" and eventually "came to bed intoxicated and initiated some pretty aggressive sex that was not [their] normal." She complied with the sexual intercourse because she was afraid to say no. After the Defendant left the house the next morning, Thursday, August 29, she participated in her Alcoholics Anonymous zoom meeting and then went to the Davidson County Family Safety Center and filed for a protective order.

Ms. Bauman testified that the Defendant texted her to say, "f*** you" after he was served with the order of protection. She said he was still at the house when she returned home accompanied by police officers. She stated that the Defendant's assault charge was pending, but that the Defendant had been convicted of violating the order of protection and sentenced to five days in jail. Without objection, the State introduced a certified copy of the Defendant's judgment of conviction for violation of the protective order.

Ms. Bauman testified that she attempted suicide on the Wednesday following the Defendant's arrest. The next day, she went to a physician, where they gave her "an EKG and physical" and measured the two-inch laceration on her scalp. Although not diagnosed, she believed that she sustained a traumatic brain injury during the assault because she experienced "bizarre headaches for eight days"; her ear was ringing; she was dizzy, lightheaded, vomiting violently and unable to focus; she slept for three days; and she was unable to speak on Wednesday, August 28. She identified photographs of her injuries showing a bruise on her left arm, a bruise and broken skin on her left breast, and the laceration to the top of her head, which were admitted as a collective exhibit.

On cross-examination, Ms. Bauman testified that she had been addicted to alcohol for approximately thirty years and had "been bipolar [for] 27 years." She said that she took the prescription medications "Lamictal and Risperdal." She disagreed that her alcohol use caused her memory lapses on the night of the assault. She stated that, following her suicide attempt, she spent the entire day at Vanderbilt University Medical Center, where she talked to the physician on duty and to a social worker, who "assessed [her] to be safe to go home." She acknowledged that she texted the Defendant on the day she took out the order of protection and on the day of her suicide attempt. She further acknowledged that the Defendant's only attempt to contact her was the single text message she described in her direct examination testimony.

On redirect examination, she agreed that the order of protection required the Defendant to vacate their shared home, but that he was still there when she arrived home with the police officers.

At the conclusion of the hearing, the State pointed out that the Defendant had successfully completed the TN-ROCS program, relapsed and gone to a rehabilitation program in California, and then relapsed again and committed the "violent and sustained attack against Ms. Bauman." The State, therefore, argued that the trial court should revoke the Defendant's probation and order his original six-year sentence into effect. Defense counsel argued that Ms. Bauman was not credible given the lapses in her memory and her testimony that the hospital sent her home following her suicide attempt. Defense counsel also requested the opportunity to have the Defendant "assessed for recovery court or some [program] with an inpatient requirement[.]"

The trial court found Ms. Bauman's testimony "to be highly credible," noting that it was not unusual in such a case for a victim to have gaps in memory and that the victim's testimony about her injuries was corroborated by photographs. The trial court found by a preponderance of the evidence that the Defendant had violated his probation by his conviction for violation of the order of protection.

The trial court granted defense counsel time to search for an appropriate inpatient treatment program but expressed doubt about counsel's ability to find one that would convince the court in light of the Defendant's violent tendencies, cautioning that any program proposed needed "to focus on anger management, domestic violence, [and] domestic violence intervention[.]"

At the February 2, 2025 continuation of the hearing, defense counsel informed the trial court that the Defendant had been accepted into "[t]he Lazarus Project," "a one-year intensive residential program that does substance abuse treatment along with mental health and trauma[-] based therapy to help people overcome their addictions." The trial court again expressed doubt about granting the Defendant another chance at an alternative sentence given his history of domestic violence despite past rehabilitation efforts. The trial court noted that while it appeared that "alcohol was a major component to this incident that led to this charge of domestic abuse" the Defendant's intoxication did not excuse his behavior. However, the trial court set the case for another hearing to allow the State time to file its response.

At the March 3, 2025 hearing, the State expressed its concern about the Defendant's history of violence and the fact that the Lazurus Project was not a lock-down facility and, once again, argued for execution of the Defendant's original sentence in confinement. Defense counsel pointed out that the Defendant's especially aggravated stalking conviction was based on non-violent behavior and argued that the Defendant should be given another chance at rehabilitation through enrollment in the Lazarus Project.

At the conclusion of the hearing, the trial court ordered the original sentence into effect, finding that the Defendant's prior history, the level of violence he displayed toward Ms. Bauman, and his having committed the offense despite successful completion of the TN-ROCS program and a stint at a California treatment facility weighed against an alternative sentence:

> But I just believe that because of the prior history, and the aggravated stalking, I've taken into account what you said, that it's calling - - it's telephone calls that it was non-violent. But he was violent with this victim, and this violation of his probation occurred after successful completion of TN[-]ROCS, and after he was in a treatment facility in California because that's where he met [Ms. Bauman].
>
> So for those reasons, I'm going to deny the request for Lazurus Project and have him serve his sentence.

On March 3, 2025, the trial court entered a written probation revocation order stating that it had found the Defendant to be "in violation of his probation by committing a new domestic assault" and "denied the [D]efendant's request for Lazarus Project Rehab as an alternative sentence based on the [D]efendant's prior history."

## ANALYSIS

On appeal, the Defendant concedes the probation violation but contends that the trial court abused its discretion when it ordered him to serve the balance of his sentence in prison rather than reinstating him to probation with court-ordered treatment. Specifically, the Defendant argues that the trial court should have allowed him "to enter the Lazarus Project consistent with [the trial court's] observations that [the Defendant's] criminal behavior was fueled by alcohol." The Defendant asserts that the Lazurus Project "addresses all of the trial court's concerns" and that the trial court's decision to deny the Defendant's request to attend "is illogical because it is inconsistent with all of the trial court's statements about the reasons for [the Defendant's] criminal behavior." The State argues that the trial court properly ordered the Defendant to serve the balance of his sentence in confinement. We agree with the State.

A trial court has the discretionary authority to revoke probation upon a finding by a preponderance of the evidence that the defendant has violated the conditions of his or her probation. Tenn. Code Ann. §§ 40-35-310(a); -311(e)(1); *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). The trial court also is vested with the discretionary authority to determine the consequences of a defendant's violation of his or her probation. *See* Tenn.

- 6 -

Code Ann. §§ 40-35-310(a); -311(e). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is illogical or unreasonable and causes an injustice to the party complaining." *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (internal quotation and citation omitted).

Probation revocation is a "two-step" process by the trial court. *State v. Dagnan*, 641 S.W.3d 751, 757 (Tenn. 2022). "The first [step] is to determine whether to revoke probation, and the second [step] is to determine the appropriate consequence upon revocation." *Id.* Each step is a separate and distinct decision, although there is no requirement that two separate hearings be held. *Id.* If the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequences on the record, this court's standard of review is abuse of discretion with a presumption of reasonableness. *Id.* at 759.

There are two types of probation violations: non-technical and technical. A non-technical violation is "a new felony, new Class A misdemeanor, zero tolerance violation as defined by the department of correction community supervision sanction matrix, absconding, or contacting the defendant's victim in violation of a condition of probation." Tenn. Code Ann. § 40-35-311(e)(2). Upon finding by a preponderance of the evidence that a defendant has committed a non-technical violation, the trial court may "cause the defendant to commence the execution of the judgment as originally entered, which may be reduced by an amount of time not to exceed the amount of time the defendant has successfully served on probation and suspension of sentence prior to the violation." *Id.*

When determining the consequences for a probation violation, "a trial court may consider 'the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character.'" *State v. Williams*, 673 S.W.3d 255, 260 (Tenn. Crim. App. 2023) (quoting *Dagnan*, 641 S.W. 3d at 759, n. 5).

We conclude that the trial court made adequate findings, supported by the record, for its decision to order the Defendant's original sentence into effect. Although the trial court recognized that the Defendant's violent behavior appeared to occur when he was under the influence of drugs or alcohol, it noted that the Defendant's intoxication was not an excuse for his behavior. It further noted that the violent domestic assault in this case occurred after the Defendant's successful completion of the TN-ROCS program and after he had been in a California treatment facility, evidencing that prior attempts at rehabilitation had not stopped the Defendant's behavior. We, therefore, affirm the judgment of the trial court revoking the Defendant's probation and ordering the original sentence into effect.

## <u>CONCLUSION</u>

Based on our review, we affirm the judgment of the trial court.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE